245 N.J. Super. 83 (1990)
584 A.2d 260
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
NELSON OTERO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1990.
Decided December 24, 1990.
*85 Before Judges SHEBELL, HAVEY and SKILLMAN.
Joseph Connor, Jr., Assistant Prosecutor, argued the cause for appellant (W. Michael Murphy, Jr., Morris County Prosecutor, attorney; Joseph Connor, Jr., on the letter brief and reply brief).
Randall W. Westreich, Assistant Deputy Public Defender, argued the cause for respondent (Wilfredo Caraballo, Public Defender, attorney; Randall W. Westreich, on the letter brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
The State of New Jersey appeals, on leave, from the Law Division's grant of a motion to suppress evidence seized from defendant, Nelson Otero, following a pat-down search for weapons. We reverse the order of suppression.
A police officer of the Township of Denville, on December 30, 1988, was dispatched at approximately 1:00 a.m. to investigate a car parked in front of a house on Ridgewood Parkway. The dispatcher indicated that a neighbor reported that the car was suspicious because the owners of the home were away.
The officer responded and discovered a Nissan automobile, with Florida license plates, parked in front of the house. The car was empty, and no one was seen in the surrounding area, although the car hood was warm. Suspicious that a burglary *86 might be in progress, the officer approached the house but did not find any sign of entry. He waited for approximately ten minutes before leaving the scene to resume general patrol. After about five minutes, he received a call from the dispatcher reporting that the same neighbor observed the occupants of the Nissan return to the vehicle via Mosswood Trail before driving in the direction of nearby Route 46. Mosswood Trail is a residential road which runs directly behind a row of commercial buildings, including a sporting goods store which defendant was later accused of burglarizing. After calling for back-up, the officer discovered the vehicle proceeding eastbound on Route 46 and followed it.
After a short distance, the car entered a parking lot in a small commercial area and stopped with its lights off. The officer positioned his vehicle to the right rear of the Nissan, projected his spotlight on the car, and approached to inquire about the situation. Another officer arrived as a back-up. The first officer approached the driver's side of the vehicle and discovered two occupants. The defendant was in the front passenger seat, and the back-up officer positioned himself on that side of the car. The driver rolled down his window, and the first officer ordered the occupants to place their hands on the dashboard. They did not comply and, according to that officer, the driver "became very defensive and started talking about his rights and was not cooperating with my request."
The two officers, unable to see the hands of the occupants, drew their guns. After drawing his weapon, the first officer took hold of the driver's clothing, opened the door, and removed him from the car. Keeping hold of the driver's clothing, that officer directed him to the back of the vehicle and performed a pat-down search for weapons. The officer felt a hard object in the suspect's pocket which turned out to be a knife. After removing the knife, the driver was handcuffed and placed in the patrol car. A pat-down of defendant's person, conducted in a similar manner, revealed a four-inch knife in defendant's pocket. Both occupants were arrested for possession of a weapon.
*87 The motion judge suppressed the knife that the officer seized from defendant after finding that the search which uncovered that evidence was not reasonable. Although the judge found that the officer had a right to approach the defendant and to make an inquiry, he concluded that "[t]here is conjecture or suspicion, there is nothing at all to articulate, nothing that has been articulated by this officer to show that he had a reasonable belief that anyone was armed with anything." The State urges that there existed sufficient articulable facts upon which the officer reasonably based his suspicion that defendant was armed. We agree.
The United States Supreme Court, in the seminal case of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), held that certain limited investigatory stops, searches, and resulting seizures are constitutional under the fourth amendment, even in the absence of probable cause. The Court recognized that police action in the nature of a "stop and frisk" falls within the purview of the fourth amendment which protects individuals from unreasonable searches and seizures. Id. at 16, 88 S.Ct. at 1877, 20 L.Ed.2d at 903. In upholding the reasonableness of the officer's conduct in Terry, the Court highlighted the necessity "`first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is `no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails'." Id. at 20-21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905 (quoting Camara v. Municipal Court, 387 U.S. 523, 534-35, 536-37, 87 S.Ct. 1727, 1733-34, 1734-35, 18 L.Ed.2d 930, 938-40 (1967)). The Court then established the requirement that in order to support the validity of a particular intrusion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.
*88 The following language from Terry has become the cornerstone of reasonableness determinations in the area of "stop and frisk" law:
The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple "`good faith on the part of the arresting officer is not enough.' ..." [Id. at 21-22, 88 S.Ct. at 1879-80, 20 L.Ed.2d at 906 (footnotes omitted) (citations omitted) (emphasis added)].
Accordingly, the Court defined the inquiry into the reasonableness of searches as "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. Terry mandates that "due weight must be given, not to his inchoate and unparticularized suspicion or `hunch,' but to the [officer's] specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id. (citation omitted).
Applying these principles, the Supreme Court, in Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), considered the reasonableness of a seizure which occurred after two police officers stopped Mimms' vehicle because his license plate had expired. Id. at 107, 98 S.Ct. at 331, 54 L.Ed.2d at 334. After stopping the vehicle, one officer approached the vehicle and asked Mimms to step out. Mimms complied, and, upon exiting the vehicle, the officer noticed a large bulge under Mimms' jacket. Id. The officer, fearing that the bulge was a weapon, performed a pat-down search of Mimms which revealed a revolver. Id. The Pennsylvania Supreme Court held that ordering Mimms out of the car was an unreasonable seizure under the fourth amendment which tainted *89 the evidence later obtained therefrom. Id. at 107-108, 98 S.Ct. at 331-32, 54 L.Ed.2d at 335. The United States Supreme Court, however, found that the search was reasonable. Id. at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 337-38.
The Mimms Court placed the focus "not on the intrusion resulting from the request to stop the vehicle or from the later `pat-down,' but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped." Id. at 109, 98 S.Ct. at 332, 54 L.Ed.2d at 336. Recognizing it as "too plain for argument" that the interest in protecting the policeman's safety is "both legitimate and weighty," the Court stated that unnecessary risks should not be placed upon the performance of the already dangerous duties of a police officer. Id. at 110, 98 S.Ct. at 333, 54 L.Ed.2d at 336. Thus, balancing the interest of police safety against the "de minimis" intrusion of asking a driver to exit the car, the Court held that prevention of "[w]hat is at most a mere inconvenience" cannot take precedence. Id. at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337.
As in Mimms, the need to check for weapons in this situation became more acute after the initial inquiry. Although the officers might have legitimately been concerned that the occupants were armed and dangerous because of the possibility of the occurrence of a burglary, they did not undertake the pat-down until the occupants refused to let their hands be seen. We are satisfied that such resistance was clearly sufficient to cause the officers to have an objective and reasonable belief that the suspects might have been armed. Terry, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 906.
Here, the first officer testified at the suppression hearing that additional precautions were taken after the occupants refused to put their hands in view because
[a]t that point, with it being one o'clock in the morning, with the incident involving the car previous to this call up, with the car and its occupants pulling into the back corner of a parking lot, with the driver being very uncooperative I *90 thought that at that point it was reasonable to move to protect myself from any possible future harm from the occupants of the car.
The police action undertaken, including the pat-down, was reasonable in light of the officers' legitimate concern for their safety.
In deciding to suppress the evidence seized from defendant in this case, the Law Division judge intimated that New Jersey's law regarding investigatory stops is more restrictive than that set forth in Terry and its progeny. However, New Jersey courts do rely upon Terry and subsequent United States Supreme Court case law in making reasonableness determinations under article 1, paragraph 7 of the New Jersey Constitution. See, e.g., State v. Lund, 119 N.J. 35, 39, 573 A.2d 1376 (1990) (citing both Terry and Mimms); State v. Thomas, 110 N.J. 673, 677, 542 A.2d 912 (1988) (applying the "principles established by the United States Supreme Court in Terry ... and its progeny" to determine the reasonableness of a search and seizure); State v. Carter, 235 N.J. Super. 232, 242-43, 561 A.2d 1196 (App.Div. 1989) (applying the United States Supreme Court's interpretation of the fourth amendment and refusing to adopt a stricter standard under the New Jersey Constitution).
In State v. Davis, 104 N.J. 490, 502-505, 517 A.2d 859 (1986), our Supreme Court summarized New Jersey law of investigatory stops in a manner which clearly demonstrated adherence to Terry principles, as reiterated in United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In Davis, the Court recognized that article 1, paragraph 7 of New Jersey's Constitution can afford an individual "greater protection against unreasonable searches and seizures" than that provided by the fourth amendment to the United States Constitution. 104 N.J. at 502, 517 A.2d 859. Nevertheless, the Court, relying on Terry, applied the law in a manner mirroring federal law, stating:
In sum, to determine the lawfulness of a given seizure under New Jersey law, it is incumbent upon a reviewing court to evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest *91 in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions. An investigatory stop is valid only if the officer has a "particularized suspicion" based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of the circumstances with which he is faced. Such observations are those that, in view of the officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonable [sic] warrant the limited intrusion upon the individual's freedom. [Id. at 504, 517 A.2d 859].
New Jersey law unquestionably permits police to "stop and frisk" an individual in the absence of probable cause to arrest. See State v. Lund, 119 N.J. at 39, 573 A.2d 1376. The inquiry into the propriety of such conduct involves the question of "whether a reasonably prudent person would be warranted in the belief that his or her safety or that of others was in danger." Id. at 45, 573 A.2d 1376.
Our Supreme Court in State v. Thomas, 110 N.J. at 678-79, 542 A.2d 912 stated:
Under the Terry rule, whether there is good cause for an officer to make a protective search incident to an investigatory stop is a question separate from whether it was permissible to stop the suspect in the first place. Terry established that to protect himself, an officer may perform a reasonable search for weapons
"where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

* * * * * * * *
And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or `hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. [392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (citations omitted; emphasis supplied).]"
The court, therefore, concluded:
The reasonableness of the search, therefore, is to be measured by an objective standard. More than an officer's generalized statements and subjective impressions are required. The officer must be able "to point to particular facts from *92 which he reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968). [110 N.J. at 679, 542 A.2d 912].
Here, the investigating officer had an articulable and reasonable suspicion upon which to base his decision to approach and investigate defendant. Compare State v. Wanczyk, 201 N.J. Super. 258, 264, 493 A.2d 6 (App.Div. 1985) (presence of defendant in proximity to arson-related fire provided "articulable and reasonable" suspicion for investigatory stop); State v. Alexander, 191 N.J. Super. 573, 576, 468 A.2d 713 (App.Div. 1983), certif. denied, 96 N.J. 267, 475 A.2d 570 (1984) (three men exchanging money in "high drug area" and reacting with "surprise" at police inquiry provided a reasonable basis to suspect an illegal transaction). The minimal intrusion resulting from the officer's initial decision to determine why the vehicle was stopped at one o'clock in the morning in an otherwise unoccupied parking lot clearly must be subordinated to the State's interest in effective crime prevention.
The investigating officer, although initially performing only a field interrogation, justifiably felt compelled for reasons of safety to request that the occupants place their hands on the dashboard. The totality of the circumstances known to the investigating officer and his experience permitted his ordering the occupants to place their hands where they could be seen, even if such an order constituted a seizure of the person. See generally Brown v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 361 (1979) (discussing circumstances which amount to seizure of the person). When the occupants refused to comply with the officer's request, this resistance provided a reasonable suspicion that they might be armed, when viewed in light of the lateness of the hour, the evasiveness of their conduct, and their presence in places which aroused suspicion. The original investigatory encounter thus escalated into a "stop and frisk" by reason of the actions of the defendant and the driver. The police officer had sufficient justification for his actions at each stage of the escalating *93 encounter. The objective facts known to the officer led him to reasonably believe that his safety or that of his fellow officer would be jeopardized if preventive action were not taken. State v. Lund, 119 N.J. at 45, 573 A.2d 1376.
In summary, the totality of the circumstances, including the lateness of the hour, the suspicious positioning of the car on two occasions, the evasive conduct of the driver and the defendant when the officer requested to see their hands, and the experience and training of the officer, provided a reasonable basis for suspecting that the men might be armed. With the occupants' hands hidden, the officer was unable to assess the extent to which his safety was in jeopardy. When the occupants refused to expose their hands, justification arose for taking the "stop and frisk" steps required to ensure the officer's safety. The order of suppression is, therefore, reversed.
Reversed and remanded.