712 A.2d 1096

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JOSEPH CITARELLA, DEFENDANT–RESPONDENT.

Argued January 22, 1998—Decided June 26, 1998.

*Barbara Petersen,* Assistant Prosecutor, argued the cause for plaintiff-appellant (*William H. Schmidt,* Bergen County Prosecutor, attorney).

*Sylvia M. Orenstein,* Assistant Public Defender, argued the cause for defendant-respondent (*Ivelisse Torres,* Public Defender, attorney).

*Michael J. Williams,* Deputy Attorney General, argued cause for *amicus curiae,* Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney; *John E. Adams, Jr.,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The defendant in this case was arrested by an officer from the Fort Lee Police Department. The circumstances leading up to his arrest call for the application of search and seizure law to investigatory stops. The trial court determined that the circumstances

gave rise to a reasonable articulable suspicion that justified the initial stop of defendant by the police officer. The Appellate Division concluded that the police officer did not have a reasonable articulable suspicion to justify stopping defendant and thus reversed the trial court's denial of defendant's motion to suppress. Because there was a dissent based on the view that the police officer had sufficient information to form a reasonable articulable suspicion that defendant was engaged in criminal activity, and therefore could be stopped, the case is before us on the appeal by the State as a matter of right.

I

On August 31, 1992, at approximately 5:30 p.m., Fort Lee Police Officer Phillip Ross, in plainclothes and driving an unmarked car, was patrolling an area of Fort Lee near the George Washington Bridge. Because of a spate of recent burglaries in the area, Officer Ross was on the lookout for suspected burglars. He observed defendant, Joseph Citarella, riding a ten-speed bicycle off the south walkway exit of the bridge and then heading north on Hudson Terrace. Ross recognized Citarella from many prior contacts. Ross had arrested defendant several times for drug offenses and was present at his most recent arrest in January for driving under the influence of a controlled dangerous substance (CDS) while on the suspended list. Defendant had been arrested by Fort Lee Police on twenty-eight separate occasions. Ross knew that defendant lived approximately two miles south of the bridge—the opposite direction from which he was now headed. He had never seen defendant with a bicycle before and knew defendant generally drove an older model, four-door car.

Ross slowed and drove alongside defendant, who was pedaling slowly up a slight incline. When he and defendant made eye contact, defendant increased his speed, crossed Hudson Terrace, and jumped off the bicycle. Defendant then opened, without using a key, the rear cab of an unoccupied pick-up truck parked in the driveway of 2147 Hudson Terrace, a commercial building housing

offices and a restaurant, and started to load the bicycle into the truck. He appeared to Ross to be quite nervous. Ross had never before seen defendant or any members of his family driving a pick-up truck. Ross testified that it was at this point that he decided he was going to stop defendant as a suspicious person.

According to Ross, it is common practice for drug purchasers to drive to Fort Lee, park their cars, and travel to New York on foot or bicycle to buy drugs. Ross further claimed that bicycle thefts were not uncommon in Fort Lee. Those factors, known to Ross from his seven years of experience with the Fort Lee Police Department and his training in narcotics investigations, contributed to Ross's decision to stop defendant and inquire about his activities.

Wearing his police shield on a chain around his neck, Ross got out of his vehicle and identified himself as a police officer. Defendant turned and stared at Officer Ross for several seconds and then quickly mounted the bicycle and pedaled away. Ross chased defendant on foot for about twenty feet before he was able to grab hold of defendant and the bicycle. Defendant fell to the ground, landing in a supine position. Ross radioed for backup and instructed defendant to stay on the ground and keep his hands out of his pockets until the other officers arrived.

When Fort Lee Police Officers Favaro, Ottina, and Ginsberg, and Sergeant Dalton responded moments later, Detective Ross assisted defendant to his feet. At that point, Ross noted that defendant was sweating profusely, despite the "relatively mild" temperature. He further noted that defendant's eyes were watery and bloodshot and his pupils were slow to react to light. Based on those observations, Ross believed defendant was under the influence of a CDS. He therefore arrested defendant and read him his *Miranda* rights.

Ross conducted a search of defendant incident to the arrest, finding a folded dollar bill inside his left front pants pocket containing a white rock-like substance which he believed to be crack cocaine. Subsequent laboratory testing confirmed his belief.

Ross also found a transparent glass vial containing a liquid substance and a white powdery residue. Based on his training and experience, Ross believed the vial was for use as a "cooker" for the cocaine. After the police transported defendant to headquarters, he was strip-searched, revealing a tinfoil packet containing crack cocaine tucked inside the fly area of his jeans.

Defendant was indicted for third degree possession of a CDS in violation of *N.J.S.A.* 2C:35–10a(1). He moved to suppress the evidence obtained from Ross's search, alleging that Ross was not justified in stopping him. Based on evidence of the foregoing version of events, the trial court denied defendant's motion to suppress, concluding that Ross had lawfully stopped defendant. The court found that Ross had a reasonable basis to conclude that defendant was engaged in or about to be engaged in criminal activity based on (i) defendant's known status as an individual arrested many times by the Fort Lee Police Department for drug offenses and motor vehicle violations; (ii) the fact that defendant was heading north from the George Washington Bridge when Ross knew he lived south of that area; (iii) defendant's presence in a driveway not on his property; (iv) his seemingly imminent operation of a truck while his driver's license was suspended; and (v) defendant's hurried manner. The court further found that, after stopping defendant and observing his sweating and watery eyes, Ross reasonably concluded that defendant was under the influence of a CDS; Ross therefore had probable cause to arrest. The court concluded that the search of defendant was thus a legitimate search incident to arrest.

After the denial of defendant's motion to suppress, defendant pled guilty to the single count in the indictment. He was sentenced to five years in state prison, to be served consecutive to a five-year term simultaneously imposed for another third-degree possession conviction stemming from a separate occasion, arrest, and indictment.

On appeal, the Appellate Division reversed the trial court's denial of defendant's motion to suppress. The majority found that

Detective Ross lacked the level of suspicion needed to support an investigative stop of defendant and that Ross's chase and apprehension of defendant was an illegal seizure, and the arrest and the search incident to the arrest were fruits of that illegality and must be suppressed. Dissenting, Judge Humphreys found that the totality of the circumstances necessitated a finding that Ross had a particularized articulable suspicion of illegal activity and thus had a right to pursue and stop defendant.

## II

The issue in this case is the validity of Officer Ross's initial stop of Citarella, which led to Ross's discovery of evidence against Citarella and eventually to Citarella's arrest. (Citarella does not here challenge the constitutionality of Ross's arrest or search incident to that arrest.)

 The starting point for our analysis is the Fourth Amendment and the New Jersey Constitution's similar provision. The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *U.S. Const.* amend. IV. Our State Constitution contains virtually identical language protecting people against government intrusion. *N.J. const.* Art. 1, ¶ 7. Under those provisions, a warrantless search is per se unreasonable unless it falls within one of the few well-delineated exceptions to the warrant requirement. *State v. Demeter,* 124 *N.J.* 374, 379–80, 590 *A.*2d 1179 (1991). One of those exceptions, and the one relevant to this case, is an investigatory stop based on *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L. Ed.*2d 889 (1968). Under *Terry* and its progeny, if an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion" on the individual, the officer is justified in making an investigatory stop. *Id.* at 21, 88 *S.Ct.* at 1880, 20 *L. Ed.*2d at 906; *Adams v. Williams,* 407 *U.S.* 143, 92 *S.Ct.* 1921, 32 *L. Ed.*2d 612 (1972); *United States v. Brignoni–Ponce,* 422 *U.S.* 873, 95 *S.Ct.* 2574, 45 *L. Ed.*2d 607 (1975).

The path we take in this case is well-traveled and familiar. Our most recent exposition of the topic came in *State v. Arthur*, 149 *N.J.* 1, 691 *A.*2d 808 (1997). In *Arthur*, Plainfield detectives had observed the following: the defendant driving and parking on the street in an area known for high levels of narcotics activity; a woman entering defendant's car, talking with him briefly, and then exiting the car carrying a brown paper bag she had not carried into the car; the woman acting furtively upon exiting the car and trying to conceal the newly acquired bag; and the defendant driving away immediately after the woman exited the car. *Id.* at 10, 691 *A.*2d 808. Based on their experience, the detectives knew that paper bags were often used to transport drugs, so they stopped the woman and then the defendant in his car. *Id.* at 5, 691 *A.*2d 808. Upon a challenge by the defendant, the Court concluded that the detectives were justified in stopping the defendant because the facts "objectively gave rise to a reasonable and articulable suspicion that defendant was engaged in illegal narcotics activity." *Id.* at 12, 691 *A.*2d 808.

In reaching that conclusion, we reviewed the jurisprudence surrounding investigative stops. "[T]he level of reasonable suspicion necessary to justify an investigatory stop is 'something less than the probable cause standard needed to support an arrest.'" *Id.* at 8, 691 *A.*2d 808 (citing *State v. Thomas*, 110 *N.J.* 673, 678, 542 *A.*2d 912 (1988)). "There must be 'some objective manifestation that the suspect was or is involved in criminal activity.'" *Ibid.* (quoting *Thomas, supra*, 110 *N.J.* at 678, 542 *A.*2d 912). In evaluating the facts giving rise to the officer's suspicion of criminal activity, courts are to give weight to "the officer's knowledge and experience" as well as "rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise." *Id.* at 10–11, 691 *A.*2d 808. The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as "a

reasonable person would find the actions are consistent with guilt." *Id.* at 11, 691 *A*.2d 808.

■ Thus, the key to the inquiry is whether at the time of the stop Ross had an articulable and reasonable suspicion that Citarella was engaged in criminal activity. In order to make that determination, we must first determine when the stop occurred. Under New Jersey law, a stop occurs when the police act in such a way that a reasonable person would believe that he or she is not free to leave. *State v. Tucker,* 136 *N.J.* 158, 164–65, 642 *A*.2d 401 (rejecting the definition of "stop" contained in *California v. Hodari D.,* 499 *U.S.* 621, 111 *S.Ct.* 1547, 113 *L. Ed.*2d 690 (1991), in favor of the definition contained in *United States v. Mendenhall,* 446 *U.S.* 544, 100 *S.Ct.* 1870, 64 *L. Ed.*2d 497 (1980), and *State v. Davis,* 104 *N.J.* 490, 517 *A*.2d 859 (1986)). Under that standard, at the latest, Citarella was stopped after he took flight and when Ross began to chase him; at the earliest, Citarella was stopped when Ross first approached and identified himself as a police officer.

■ Based on the information available to Ross at the time he first stopped Citarella, an articulable and reasonable suspicion existed that justified Ross's stop of Citarella. When he first confronted Citarella, Ross had observed defendant engaged in the following actions: riding over the George Washington Bridge by bicycle; riding in a hurried fashion; putting his bicycle into the back of a pickup truck not owned by Citarella or a member of his family; acting as if he wanted to leave the area quickly in that truck; and acting nervously. Based on his experience as a police officer, Ross also knew the following information: bicycles were often used for the transport of drugs from New York City into Fort Lee; there had been a rash of burglaries in the area; Citarella had been arrested many times before for drug crimes; Citarella had never been seen riding a bicycle previously; Citarella lived two miles from the area in the opposite direction than that in which he was riding; and Citarella's driving privileges had been suspended. Even though "defendant's actions might have some

speculative innocent explanation," *Arthur, supra,* 149 *N.J.* at 11, 691 *A.*2d 808, they also are reasonably consistent with illegal activity; therefore, Officer Ross had the required level of suspicion to conduct a *Terry* stop.

Both lower courts emphasized the significance of flight as a basis for finding a reasonable articulable suspicion that an individual is engaged in criminal activity. The circumstances known to Officer Ross not including flight, however, were sufficient to create the reasonable articulable suspicion required to conduct an investigatory stop. Citarella's flight from Officer Ross became an additional factor that heightened the level of reasonable articulable suspicion already engendered by Citarella's antecedent actions. *See, e.g., State v. Seymour,* 289 *N.J.Super.* 80, 89, 672 *A.*2d 1273 (App.Div.1996); *State v. Ruiz,* 286 *N.J.Super.* 155, 162–63, 668 *A.*2d 460 (App.Div.1995), *certif. denied,* 143 *N.J.* 519, 673 *A.*2d 277 (1996); *In re J.B.,* 284 *N.J.Super.* 513, 518–19, 665 *A.*2d 1124 (App.Div.1995); *State v. Ramos,* 282 *N.J.Super.* 19, 22–23, 659 *A.*2d 480 (App.Div.1995); *State v. Gates,* 306 *N.J.Super.* 322, 334, 703 *A.*2d 696 (Law Div.1997). Although not essential in the determination that there was a valid basis to subject defendant to an investigatory stop, flight adds weight to the already existing reasonable articulable suspicion that is the measure of constitutional reasonableness of an ensuing search and seizure.

We thus conclude that, regardless of whether we consider Officer Ross to have stopped Citarella when he first approached defendant or when he gave chase, Officer Ross had sufficient objective indicia coupled with his experience as a narcotics officer to give rise to a reasonable articulable suspicion that Citarella was engaged in criminal activity. The stop and the ensuing search were therefore constitutional.

III

We reverse the judgment of the Appellate Division.

*For Reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.