742 A.2d 1039 (2000)
327 N.J. Super. 227
STATE of New Jersey, Plaintiff-Respondent,
v.
Stanley GOREE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted November 17, 1999.
Decided January 13, 2000.
*1041 Ivelisse Torres, Public Defender of New Jersey, for defendant-appellant (Samuel T. Stewart, Designated Counsel, of counsel and on the brief).
Lee A. Solomon, Camden County Prosecutor, for plaintiff-respondent (Robin A. Hamett, Assistant Prosecutor, of counsel and on the brief).
Before Judges KING, PAUL G. LEVY and LEFELT.
*1040 The opinion of the court was delivered by KING, P.J.A.D.
I
Defendant Stanley Goree appeals from his conviction on drug distribution charges and his extended-term sentence, nine years with a four-year parole ineligibility term. Defendant raises six claims of error on the appeal. We conclude that the Law Division judge erred in denying defendant's motion to suppress evidence seized in violation of his constitutional rights, R. 3:5-7, and reverse the conviction. We find that the police had no reasonable articulable suspicion which justified ordering defendant out of a neighborhood taproom and subjecting him to a "pat-down" on the sidewalk. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We reverse the conviction.
II
On October 10, 1996 at 7:50 p.m. Officer Brown of the Camden City Police Department was dispatched to Tioga and Van Hook Streets in Camden. Brown said: "We got a call that said there was an individual in a purple and green jeep in possession of a handgun." This was "an anonymous tip." More specifically, Brown testified he noted in his report the dispatch was in reference to a "black male, a purple and green MPV [multi-purpose vehicle], in possession of a handgun." The tow-truck report described a "1994 two door tracker," not a jeep. In his report Brown described the vehicle as an "MPV 1994 Geotracker." This is all the information Brown had.
When Brown arrived at Tioga and Van Hook he did not see anything which confirmed the anonymous tip. He did see a green and purple MPV a block away at Tioga and Central Streets. Brown described that location as an "active drug area." The Tioga Bar is on this corner. Brown did see a black man, the defendant Goree, inside the Tioga Bar. He had seen the defendant driving the purple and green "jeep" several times before this. He had never seen another vehicle like this in the area before.
Officer Brown looked inside the jeep to see if it was occupied. He found no one and saw no gun. He then went inside the Tioga Bar and asked the defendant, "Are you driving the jeep outside?" Defendant answered, "No, but I have the keys." Brown then asked defendant to step outside. Once outside, Brown tried to pat down defendant for weapons.
When questioned about how far he had proceeded in his attempt to pat-down the defendant, Brown testified that he "didn't get that far. After we asked him to put his hands, you know, he kept turning away like, you knowwhat are you doing; I didn't do anything." Four officers were present by that time. When Brown and the defendant walked outside the bar, Brown testified that he did not recall defendant telling him he had recently been discharged from the hospital after having stomach surgery. Brown testified defendant told him this at a later time. Brown *1042 also testified that he did not see any bulges around defendant's stomach area.
Brown said that when he attempted to tell defendant to put his hands on the car in order to pat him down, defendant refused, became belligerent and did not want the officers to touch him. Brown also said that "[w]hen I took him to pat him down, he appeared agitated and he wouldn't keep his hands on the car, and then he finally turned and pushed me away and attempted it appeared he attempted to go into his pockets." At that point, Brown and the other officers who had responded to the scene attempted to grab defendant because they feared he had a weapon. Brown testified that "[w]hen we attempted to subdue him, he went inside ... one of his pants pocket[s] and pulled out a clear bag and [there] appeared to be pink items inside of it, which was consistent with the package of the narcotics, and threw it to the ground." Brown also said that "I had the arm that he stuck in his pocket, that's the arm I had. I was trying to pull it away, and he's a big boy. He still got it in his pocket. He got his hand in his pocket." Brown testified that because of his size and strength, defendant was able to reach into his pocket and pull something out despite the fact that Brown had both hands on his arm and there were three other police officers trying to subdue him. Brown said that the defendant took the bag out of his front pocket and "kind of tossed it attempted to toss it while [he] still had his handit didn't go very far." The bag landed on the street by the curb. The police never found a gun, either on defendant or in the car.
The judge summarized his findings of fact based upon the testimony of the witnesses. He found Brown's testimony uncontradicted and credible. The judge found that
[t]he officer testified that he received a dispatch from the dispatcher of an anonymous tip that a black male in a purple and green MPV had in his possession a handgun.... The officer went to that location and indicated he did not see the vehicle there, but he located a vehicle matching that description approximately one block away. He indicated that he recognized the vehicle as a vehicle driven by this defendant. He also indicated that there were no other vehicles that he's ever seen in that area matching that description of the black and the green. He saw that the vehicle was parked in close proximity of a bar located on the corner. He went into the corner bar and there he saw the defendant who he had previously seen driving that vehicle.
* * * * *
He indicated he spoke to the defendant and asked him whether or not he was driving that vehicle, and the defendant indicated that he was not driving it, but he did have the key to it. The officer then asked him to walk outside with him and he complied. The officer then indicated that they received a report. He was asking whether or not he could pat him down to see whether or not he had a weapon.
The judge noted that
inherent with any type of handgun in the possession of someone that there's always a danger of someone being injured. The officers had received information from an anonymous tip. They corroborated that tip by locating the vehicle that was described in the tip. They also confirmed that the defendant, a black male, matched the description that was given to them. And therefore while it is limited confirmation of the information, there's no doubt that this defendant was in facthad possession of that vehicle because he indicated he had the keys for it.
The judge further found that
[t]he officers then told him to put his hands up on the car and were going to pat him down. The defendant turned away and began to put his hand in his pocket. The officer reacted to that believing *1043 he could possibly be reaching for a weapon and tried to restrain him from doing so. There was a struggle. And during the struggle while the officer was holding on to the defendant's arm, the defendant managed to pull from his pocket a ... clear plastic bag containing [thirty-five] pink bags with a white substance in it and also [four] ziplock bags. And the defendant dropped that to the street.
The judge found that the officers were justified in conducting the pat-down search. He first noted that this is not a case of probable cause, but rather a case of reasonable suspicion under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The controlling issue was whether a limited pat-down for the purpose of protecting the officers was justified. In determining whether the pat-down search of defendant's person was lawful, the judge relied in part on State in the Interest of H.B., 75 N.J. 243, 381 A.2d 759 (1977). He found that
the officer was basing his actions and had reason to believe the defendant was armed and that a limited pat downa limited intrusion upon his person was necessary for that purpose. Again, the defendant escalated their suspicion by struggling with them. Accordingly, the fact that it did not turn out to be a handgun but it turned out to be contraband which the officers recognized and the defendant took it out and dropped it does not matter as to the reasonableness of their initial Terry search.
The judge concluded that
the officers had specific facts that demonstrate that a reasonable and prudent person in their circumstances would be warranted in the belief that their safety and the safety of others was in danger. Therefore, I find their conduct in asking him so that they can pat him down was justified. Again, it was further heightened by the defendant's actions.
With regard to the controlled dangerous substance which defendant allegedly dropped or threw from his pocket, the judge found the "plain view" doctrine applied. The judge ruled that the evidence was inadvertently discovered because the defendant pulled it from his pocket and discarded it. Since the officer recognized contraband, the plain view doctrine was satisfied.
III
Defendant urges that the judge erred in denying his motion to suppress. According to defendant, "the court below has ventured far beyond the limitations recognized by the United States Supreme Court and the New Jersey Supreme Court ..." and "[t]he ruling of the court below ... establishes a new judicial rule which eliminates the long-standing requirement that police, before invading a citizen's privacy, must have a reasonable, articulable, basis grounded in fact to suspect that the private citizen is armed and dangerous." Defendant argues that there was no sound reason to select the defendant in particular for a pat-down search. The defendant admits he is a black male and told the police that he had the keys to the MPV. However, defendant contends that based on the information given in the anonymous tip, there was no justification for the police to invade his privacy. He urges that because of the vague description of the vehicle, the almost non-existent personal description (a "black male") of the individual suspect, defendant's cooperation while in and leaving the bar, the fact that the described vehicle was not at the tipped location, Tioga and Van Hook Streets, that there was no gun or person seen inside of the vehicle described by the anonymous caller, and no visible bulges in his clothing, the officer had every good reason to doubt the reliability of the anonymous tip by the time he arrived at Tioga and Central and confronted defendant in the bar. Indeed, in retrospect the "tipster" was not very accurate at all.
*1044 Defendant's claim presents two questions: first, at what point was Goree subject to an investigatory stop which implicated his constitutional rights, and second, did Officer Brown have the reasonable suspicion required to justify the stop and pat down. See State in the Interest of C.B., 315 N.J.Super. 567, 572, 719 A.2d 206 (App.Div.1998).
The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. State v. Citarella, 154 N.J. 272, 278, 712 A.2d 1096 (1998). Our State Constitution contains virtually identical language protecting persons against government intrusion. Id. "Under New Jersey law, a stop occurs when the police act in such a way that a reasonable person would believe he or she is not free to leave." State in the Interest of C.B., 315 N.J.Super. at 572, 719 A.2d 206 (quoting State v. Citarella, 154 N.J. at 280, 712 A.2d 1096 (1998)). "[T]he level of reasonable suspicion necessary to justify an investigatory stop is `something less than the probable cause standard needed to support an arrest.'" Citarella, 154 N.J. at 279, 712 A.2d 1096 (quoting State v. Arthur, 149 N.J. 1, 8, 691 A.2d 808 (1997)). The defendant in this case before us could not reasonably have believed that his freedom of movement was restrained when Brown asked him "are you driving the jeep outside," to which the defendant responded "[n]o but I have the keys." The police do not effectuate a stop simply by approaching a person to ask questions. State in the Interest of C.B., 315 N.J.Super. at 572, 719 A.2d 206. An investigatory stop did occur, however, when Officer Brown asked defendant to step outside and place his hands on the vehicle so that he could conduct a pat-down search.
In Terry v. Ohio, the Supreme Court established the standards governing what has come to be known as the "stop and frisk." To justify such an investigatory stop, a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." State in the Interest of C.B., 315 N.J.Super. at 573, 719 A.2d 206 (citing Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905). Chief Justice Warren, writing for the court, stated that
there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.
[Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1868.]
In our more recent decision of State v. Valentine, 134 N.J. 536, 541, 636 A.2d 505 (1994), our Supreme Court reaffirmed the Terry standards governing the propriety of a warrantless "stop and frisk." Our Supreme Court has interpreted the New Jersey Constitution to afford the same, not greater, protection as the Fourth Amendment with respect to investigatory stops and pat-down searches for weapons incident to such stops. See Valentine, 134 N.J. at 543, 636 A.2d 505. The federal and state standards are thus identical. Justice Garibaldi, writing for the Court in Valentine, found that "courts judge the reasonableness of the pat-down within the context of the circumstances confronting the police officer." Ibid. Justice Garibaldi also recognized that the Terry standard is an objective one, but
[t]he process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated common-sense conclusions about *1045 human behavior; jurors as factfinders are permitted to do the same and so are law enforcement officers....
[Ibid.]
See State v. Contreras, 326 N.J.Super. 528, 536-37, 742 A.2d 154 (App.Div.1999). Even in situations in which an officer does not believe a suspect is engaged or about to become engaged in violent criminal activity, the right to frisk for weapons during a permissible investigatory stop is frequently automatic where a police officer has a specific and objectively credible reason to believe that the suspect is armed. Valentine, 134 N.J. at 545, 636 A.2d 505. Justice Garibaldi also noted that "[w]e are mindful of Judge Friendly's warning that `courts should not set the test of sufficient suspicion that the individual is `armed and presently dangerous' too high when protection of the investigating officer is at stake.'" Ibid. (citing United States v. Riggs, 474 F.2d 699, 705 (2d Cir.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973)).
In State v. Zapata, 297 N.J.Super. 160, 173, 687 A.2d 1025 (App.Div.1997) certif. denied, 156 N.J. 405, 719 A.2d 637 (1998), we found that "an anonymous call may provide the factual predicate to justify an investigatory stop when there is corroboration of the information furnished." See Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 2415-16, 110 L.Ed.2d 301, 308 (1990) (finding that a telephone tip from an unknown informant does not provide the objectively reasonable suspicion required for a Terry stop and frisk unless it is corroborated by other evidence). Judge Michels, writing for the panel, found that where the reliability of the anonymous tip is established through independent police work, investigatory stops based on such tips are permissible. Zapata, 297 N.J.Super. at 173, 687 A.2d 1025. In that case we adopted a totality of the circumstances approach to determine whether reasonable suspicion was established to justify an investigatory stop. Id. at 172, 687 A.2d 1025.
In the more recent cases of State v. Sharpless, 314 N.J.Super. 440, 450, 715 A.2d 333 (App.Div.1998), and State in the Interest of C.B., we did say that because of the imminent danger posed by firearms, an anonymous tip that a person is armed should be treated differently than a tip concerning other forms of criminal activity and that such a tip may provide the basis for a stop and frisk even though the informant does not make any prediction of future behavior which is verified by police observations.
[See State in the Interest of C.B., 315 N.J.Super. at 475, 719 A.2d 206; (citing Sharpless, 314 N.J.Super. at 450, 715 A.2d 333); see United States v. DeBerry 76 F.3d 884 (7th Cir.1996); see United States v. Gibson, 64 F.3d 617 (11th Cir.1995); see United States v. Clipper, 973 F.2d 944 (D.C.Cir. 1992); see United States v. Bold, 19 F.3d 99 (2d Cir.1994).]
In this case before us, Officer Brown had a right, if not an obligation, to proceed to the location where the anonymous informant said they would find a man with a gun, even though this information may not provide the individualized suspicion required for a Terry "stop and frisk." See State v. Padilla, 321 N.J.Super. 96, 106, 728 A.2d 279 (App.Div.1999); see State in the Interest of C.B., 315 N.J.Super. at 576, 719 A.2d 206. The issue here is whether, based solely on the anonymous tip, Officer Brown had sufficient reasonable suspicion to ask defendant to step outside the taproom and to frisk him. In State in the Interest of H.B., an officer of the Newark Police Department was on duty in a radio car when he received a radio dispatch from police headquarters that a black male wearing a black hat, black leather coat and checkered pants was in a luncheonette with a gun in his possession. 75 N.J. at 248, 381 A.2d 759. The officer proceeded to the area. Ibid. As the officer entered the front door, he saw about fifteen people in the *1046 luncheonette. Ibid. He also observed a black male with a black hat, black leather coat, checkered pants and sneakers. The officer walked up to a male occupant, later identified as the defendant, and asked him to stand and put his hands on the wall. The officer patted him down or frisked him, and in doing so felt an object in the right-hand coat pocket which was a gun. Ibid. Chief Justice Hughes, writing for the Court, placed great emphasis on the accuracy of the informer's detailed description of the suspect in upholding the search. The description of H.B.'s person and clothing was "precisely accurate." Ibid. Our Supreme Court concluded that the police action was justified and that the motion to suppress was properly denied. The Court observed that "we intend our decision here, justifying a protective frisk, to be narrow enough to be understood as comprehending only such lethal material, vis-a-vis gambling paraphernalia or narcotic contraband, for instance, although they too would evidence criminal activity." Id. at 251, 381 A.2d 759. In the case before us today, the anonymous tip was hardly "precisely accurate" in any respect of the phrase.
In State in the Interest of C.B., an officer received a radio dispatch to investigate a report of a man with a gun at the intersection of 9th and Pearl Streets. The dispatch was based on an anonymous tip. 315 N.J.Super. at 571, 719 A.2d 206. The tip did not include a description of the person suspected in possession of the gun. When the officers arrived on the scene, they observed three or four men; one was the defendant. When the juvenile suspect saw the police approaching, he fled on his bicycle. He then stopped, got off his bicycle, and put his hands in his pockets. Ibid. At this point, the officers left their van, approached the suspect, and directed him to remove his hands from his pockets. One of the officers grabbed the defendant's hands and pulled them out of his pockets. As the defendant's hands came out of his pockets, a sandwich bag containing marijuana fell to the ground.
We found because the information received by the police did not include any description of the appearance of the man allegedly in possession of a gun and because the police observed three of four persons standing around when they arrived at the location identified by the informant, the anonymous tip was not sufficiently corroborated to justify an investigative stop and weapons search of the defendant. We found, however, that
under the totality of the circumstances known at the time, which included the anonymous information concerning a man with a gun at the intersection of 9th and Pearl Streets, the juvenile's flight from that intersection, and the juvenile's thrusting of his hands into his pockets as the police approached, there was an objectively reasonable basis for suspicion that he was armed and dangerous.
[Id. at 577, 719 A.2d 206.]
We ultimately held the limited intrusion involved in the officers pulling the juvenile's hands out of his pockets did not constitute an unconstitutional search and seizure. Id. at 577, 719 A.2d 206.
In Sharpless, we addressed the issue of whether the police may stop and conduct a pat-down search of a person whose physical description matches the description contained in an anonymous informant's tip concerning a man armed with a gun, even though the tip is not corroborated by observations of the suspect's conduct which correspond with conduct predicted by the informant. Sharpless, 314 N.J.Super. at 445, 715 A.2d 333. The officer there testified that he received a radio dispatch reporting that someone had seen a black man wearing a green jacket with a hood, armed with a handgun in the area of Atkins Avenue and Adams Street in Asbury Park. The officer drove to the location mentioned in the dispatch and saw a man, later identified as the defendant, standing on a mound of dirt with his hands in his pockets. When the officer approached, defendant took his right hand out of his *1047 pocket and started to walk away. At this point the officer hollered to defendant to take his other hand out of his pocket and to get down on the ground. Defendant responded by saying: "[W]hat for, I didn't do nothing." Ibid. The officer kept yelling at defendant to take his hand out of his pocket and get down on the ground but defendant did not respond. Ibid. Eventually, the officers, at gunpoint, compelled defendant to lie down. The officers conducted a pat-down search for weapons, which revealed nothing. After arresting the defendant for "alarming conduct" and returning to the area where defendant was standing, the officer found twenty-three "decks" of heroin in glassine bags.
Judge Skillman, writing for this court, stated that
we are persuaded by the reasoning of [U.S. v.] Clipper [297 U.S.App.D.C. 372, 973 F.2d 944 (D.C.Cir.1992),] and the other federal circuit courts' decisions that under White's totality of the circumstances test, an anonymous tip relating to possession of a gun may justify an investigatory stop and pat-down search for weapons even though the tip is not corroborated by police observations which conform with the informant's predictions regarding the suspect's future conduct.
[Id. at 451-52, 715 A.2d 333.]
Judge Skillman also stated that
[t]he police cannot simply ignore information that an armed person is standing on a street corner, and when the police see someone whose appearance matches that of the alleged armed person, this provides a reasonable basis for them to stop and question the person and at least in some circumstances to conduct a pat down search for weapons.
In this case, defendant's failure to accede to Officer Tilton's initial demand that he remove his hand from his pocket and his attempt to walk away from the officer provided an objectively reasonable basis for suspicion that the informant's tip was accurate and that the defendant in fact possessed a weapon.
[Id. at 452, 715 A.2d 333.]
In the present case, the anonymous tip giving rise to the investigation and eventually the "stop and frisk" of defendant revealed only that a black male in a green and purple MPV in the area of Tioga and Van Hook streets in Camden was supposedly in possession of a handgun. This description alone did not provide the objectively reasonable suspicion required for an investigatory stop unless it was sufficiently corroborated by other evidence. State in the Interest of C.B., 315 N.J.Super. at 573, 719 A.2d 206. In this case, unlike Sharpless, the information received by the officer did not include any description of the man allegedly in possession of a handgun, except that he was a black male in the inner city. When the police officer approached and talked to defendant he had no description to confirm the defendant actually was the "black man with a gun in the vehicle." The description supplied by the anonymous tipster was not nearly as precise as the description given in State in the Interest of H.B.; here there was no physical description of the defendant at all. Similar to State in the Interest of C.B., the information received by the officer did not include a description of the appearance of the man allegedly in possession of a handgun. However, in contrast to State in the Interest of C.B., in the present case there was no attempt on the part of the defendant to flee the scene or any other suspicious behavior before the attempted pat-down. He was simply a man sitting in the corner bar. The police did not observe any criminally suspicious conduct by the defendant prior to the attempted pat-down; no weapon was found; no bulge or possible gun was protruding around or from defendant's pocket, and defendant did not offer any resistance, until after the officer attempted to pat him down outside. Nor did defendant engage in any future conduct predicted by the tipster, as in Alabama v. White, *1048 496 U.S. at 332, 110 S.Ct. at 2417, 110 L.Ed.2d at 310.
The vehicle described by the anonymous tipster was a green and purple "jeep." Officer Brown found the described vehicle a block away from the location the anonymous tipster specified. When approached by Officer Brown, defendant admitted he had the keys to this vehicle. Officer Brown recognized the defendant. He had seen him driving the vehicle on earlier occasions around Camden. And while defendant offered no resistance when asked to step outside, he later allegedly pushed Officer Brown away as he attempted a pat down search of defendant's person. See State v. Otero, 245 N.J.Super. 83, 584 A.2d 260 (App.Div.1990). In Otero, the officer's initial stop of defendant's automobile was justified since he had an articulable and reasonable suspicion that defendant was involved in a nearby house burglary. After the stop, the officer requested that the defendant place his hands on the dashboard of the car. The defendant, however, refused to comply, and this resistance provided the officer with a reasonable suspicion that the defendant may have been armed. The court held that the subsequent frisk was valid since "[t]he original investigatory encounter thus escalated to a `stop and frisk' by reason of the actions of the defendant...." Id. at 92, 584 A.2d 260.
While defendant here did not act suspiciously prior to Officer Brown's attempt to conduct a pat-down, he did act suspiciously once the officer attempted to conduct the pat-down. But unlike Sharpless and State in the Interest of C.B., defendant's suspicious behavior began after Officer Brown attempted to conduct a pat down search, not before the attempted limited search.
IV
This is a close case. But we conclude that Officer Brown did not have enough information to reasonably suspect he was dealing with an armed and dangerous individual when he asked defendant to step out of the Tioga Bar at 7:50 p.m. on October 10 and submit to a pat-down for weapons. Nothing about defendant's conduct before the pat-down was attempted suggested defendant was armed or in any way corroborated the anonymous tip. The description, in effect: "a black male in a distinctive vehicle has a handgun" was too generalized and the circumstances revealed by the police follow-up so totally unsuspicious (until the pat-down commenced), to justify law enforcement intrusion. Any number of other black males could have been in the MPV earlier. But we do not hesitate to add that this is certainly a case where the mistakenly undertaken intrusion by the officer was made in "good faith." See Russell v. Coyle, 266 N.J.Super. 651, 656, 630 A.2d 396 (App. Div.1993),certif. denied, 135 N.J. 302, 639 A.2d 302 (1994).
The case before us is similar to J.L. v. State of Florida, 727 So.2d 204 (Fla.1998), decided on December 17, 1998, a case which split the Florida Supreme Court 4 to 2. The United States Supreme Court recently granted certiorari in J.L. in November 1999, Florida v. J.L., ___ U.S. ___, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999). In J.L., the majority described the scenario developing after the anonymous telephone tip this way:
In this case, the police received an anonymous tip stating that several young black males were standing at a specified bus stop during the daylight hours. The anonymous informant stated only that one of the individuals, the one wearing the "plaid-looking" shirt, was carrying a gun. Two police officers arrived at the specified bus stop approximately six minutes after receiving the anonymous tip and observed three black males, one of whom was wearing a plaid shirt. The three males were engaged in no suspicious or illegal conduct and no additional suspicious circumstances were observed by the officers. One of the officers immediately accosted J.L., who was wearing a plaid shirt, and *1049 ordered him to put his hands above his head. Then, without questioning or other introduction, the officer proceeded to frisk J.L. and seized a gun from J.L.'s left pocket.
The Supreme Court of Florida found that this rather classic "anonymous tip" situation did not provide enough of the requisite reasonable suspicion to justify a stop and frisk. The court recognized that "anonymous tips must be closely scrutinized." Id. at 206. "[A]n anonymous tip can provide the basis for reasonable suspicion, provided that it can be established that the tip is reliable." Ibid. But this requires "something more than just a verification of innocent details." Id. at 207. The police must observe additional suspicious circumstances as a result of independent investigation.
The Florida court's majority made this telling observation concerning the anonymous tip about the young men standing at the bus-stop:
Initially, we must observe that the essential issue presented here would be the same whether the anonymous tip involved three white males in business suits waiting for a taxi, or three white females waiting for a ride to a certain location. The officers received an anonymous tip that a young man was carrying a concealed weapon. The tip disclosed that the young man was standing by a bus stop at a specific location and that he was wearing a plaid-looking shirt. The reliability of this tip was not proven by any of the previously described ways recognized as sufficient in our case law. The tip did not involve suspicious behavior which the police could have verified as suspicious upon arrival; rather the tip involved innocent details, none of which involved incriminating or criminal behavior.
Further, the innocent details provided in the tip did not involve future action for which the police could verify whether or not such future action would occur; rather the tip involved present action which could have been provided by "any pilgrim on the roadway." Butts, 644 So.2d at 606 (quoting Robinson, 556 So.2d at 452). Finally, the presently occurring innocent detail tip was not corroborated through an independent investigation on the part of the police which established that the suspect was engaging in suspicious behavior; rather "the officers' independent investigation added nothing to the reliability of the tip"the officers merely verified that the defendant was in fact standing by the bus stop and wearing a plaid shirt, neither of which is suspicious.
[Ibid.]
These comments are equally applicable to the situation before us. The Florida majority added: "We are aware that other jurisdictions appear to recognize a `firearm exception' to the reasonable suspicion test." Id. at 208. The Florida majority said: "We join the Supreme Court of Pennsylvania in rejecting this exception," id. at 208-09, see Commonwealth v. Hawkins, 547 Pa. 652, 692 A.2d 1068, 1071 (1997), and refused to create an "exception to an exception." The Florida court determined "that there is no firearm or weapons exception to the Fourth Amendment and the bare-boned anonymous tip involved herein, by itself, did not provide the police with sufficient cause to stop and frisk." Id. at 209.
As all would acknowledge, these anonymous-tip gun and drug cases, especially gun cases, are close and difficult, wafting about in a "no-man's land" of nuances. On the subject, Chief Justice Rhenquist stated in Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972), a case where the tipster was known to the officer personally and had provided some information in the past, "[t]his is a stronger case than obtains in the case of an anonymous telephone tip." The informant in Adams v. Williams, told the officer "that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist, early in the morning in a *1050 high-crime area of Bridgeport, Connecticut." Id. at 144, 92 S.Ct. at 1922, 32 L.Ed.2d at 616. And the commentators seem to agree that Adams v. Williams was about the closest case of this type in which the government could prevail. See discussion 4 LaFave, Search and Seizure, § 9.4(h) at 213, 230 (3rd ed.1996), especially cases collected at 222, fn. 391. E.g., People v. DeBour, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976) (anonymous call that black man in bar with red shirt had gun insufficient; Court of Appeals said anonymous tips "are of the weakest sort since no one can be held accountable if the information is in fact false.") In Alabama v. White, 496 U.S. at 332, 110 S.Ct. at 2417, 110 L.Ed.2d at 310, also termed a "close call" by Justice White, the tipster predicted certain "future behavior" by the suspect which police corroborated, to an extent, independently of the tipster. We have nothing like that predictive corroboration in the case before us.
We must remember that a "warrantless search is presumed to be invalid." State v. Valencia, 93 N.J. 126, 133, 459 A.2d 1149 (1983); Pressler, Current N.J. Court Rules, comment on R. 3:5-7(b) (2000); Byrnes, New Jersey Arrest, Search and Seizure § 5.2 at 63 (1999-2000). The State must prove the overall reasonableness of the search. Valencia, 93 N.J. at 133, 459 A.2d 1149. We conclude the State has not carried its burden here.
We decline to embrace a "man with a gun exception" to the rule of individualized reasonable suspicion to "stop and frisk." As Justice White said in Alabama v. White, 496 U.S. at 329, 110 S.Ct. at 2415-16, 110 L.Ed.2d at 308: "Simply put, a[n] [uncorroborated anonymous] tip such as this one, standing alone, would not warrant a man of reasonable caution in the belief that a stop was appropriate," citing Terry v. Ohio, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 889.
Reversed.