798 A.2d 136 (2002)
351 N.J. Super. 289
STATE of New Jersey, Plaintiff-Respondent,
v.
Michael RICHARDS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 23, 2002.
Decided May 31, 2002.
*138 Peter A. Garcia, Acting Public Defender, attorney for appellant (Joan T. Buckley, Designated Counsel, of counsel and on the brief).
Michael M. Rubbinaccio, Butler, Morris County Prosecutor, attorney for respondent (Joseph Connor, Jr., Madison, on the brief).
Appellant filed a pro se supplemental brief.
Before Judges STERN, EICHEN and COLLESTER.
*137 The opinion of the court was delivered by EICHEN, J.A.D.
Following the denial of his motion to suppress evidence, defendant Michael A. Richards was tried to a jury, in absentia, and found guilty of third degree possession of cocaine, N.J.S.A. 2C:35-10a(1) (count one), and second degree possession of cocaine with the intent to distribute, N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(2) (count two). Pursuant to N.J.S.A. 2C:43-6f, the judge sentenced defendant to a mandatory extended term as a subsequent drug offender and imposed a custodial term of sixteen years with seven years of parole ineligibility on count two and merged count one into count two. The judge found defendant guilty of possession of marijuana, N.J.S.A. 2C:35-10a(4) and sentenced him to a concurrent 180-day term of imprisonment.[1]
On appeal, defendant makes the following arguments:
POINT I
THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED THE DEFENDANT'S MOTION TO SUPPRESS BECAUSE THE POLICE CONDUCTED A STOP THAT VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS AND THE EVIDENCE FOUND WAS FRUIT OF THE ILLEGAL STOP.
A. THE DEFENDANT WAS SUBJECT TO A STOP THAT IMPLICATED HIS CONSTITUTIONAL RIGHTS.

*139 B. THE POLICE DID NOT HAVE THE REASONABLE SUSPICION REQUIRED TO JUSTIFY A STOP.
C. THE DISCOVERY OF DRUGS WAS A RESULT OF THE ILLEGAL STOP OF THE DEFENDANT.
POINT II
THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO GRANT THE DEFENDANT AN ADJOURNMENT AND CONDUCTED THE TRIAL WITHOUT THE DEFENDANT BEING PRESENT.
POINT III
THE TRIAL COURT ABUSED IT DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT SENTENCED THE DEFENDANT TO A SIXTEEN YEAR TERM, WITH AN EIGHT YEAR PAROLE DISQUALIFIER, FOR COUNT 2 BECAUSE THE COURT IMPROPERLY EVALUATED THE MITIGATING FACTORS.
In his pro se supplemental brief, defendant raises the following argument:
POINT I
THE PROSECUTOR'S EGREGIOUS COMMENTS DURING HER SUMMATION DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL IN VIOLATION [OF] DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS, U.S. CONST. AMENDS. VI AND IVX [sic]; N.J. CONST. (1947) ART. 1 PAR. 10.
We conclude that under the totality of the circumstances, the officers did not have the requisite objective articulable and reasonable basis to believe defendant was in possession of a handgun to justify the investigative detention or "stop" of defendant in this case. Accordingly, the arrest and search incident thereto was illegal, and the contraband found as a result of that seizure must be suppressed. Therefore, it is unnecessary for us to render a decision on the remaining issues. Nonetheless, we have reviewed the arguments and conclude they are without merit. R. 2:11-3(e)(2).
The issue presented by this appeal concerns the validity of the police officer's investigatory stop of defendant under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968). Defendant's challenge to the constitutionality of his arrest and search incident to that arrest is made under the "fruit of the poisonous tree" doctrine. See Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L. Ed.2d 441, 455 (1963).
The facts developed at the suppression hearing were presented through the State's sole witness, Morristown Police Officer Joseph Leeper. At about 1:30 a.m. on April 15, 1997, Morristown Lieutenant James Wilcox contacted Officer Leeper, stating that he had received an anonymous telephone call at police headquarters.[2] The caller said "that three black males" were involved in "narcotics transactions." The caller also stated that "two ... were standing in front of 15 [Martin Luther King Avenue]," and "a third male ... was on the pay phone at Number 60 Abbett Avenue," the site of Dean Tire Company (Dean Tire). The anonymous caller also said that one of the men was "supposedly car[ry]ing a .22 caliber handgun." No descriptions of the men other than their race were given, and no information concerning the identity or the past reliability of the *140 informant, if he or she was known, was conveyed by Lieutenant Wilcox to Officer Leeper.
Dean Tire is a tire center with ancillary gas pump facilities on the premises. It is located in a residential, low income neighborhood, populated primarily by black and Hispanic residents. No evidence was presented that the area was a high-crime or high-drug area. A public pay phone is located in the rear of its parking lot.
Acting on the dispatch from Lieutenant Wilcox, Officer Leeper immediately met with the other patrol officers on duty in the area during the 5:30 p.m. to 4:15 a.m. shift, and after a brief meeting, he directed several of them to respond to 15 Martin Luther King Avenue.[3] Then, he and Officer Joseph Lodato proceeded to Dean Tire. According to Officer Leeper, "[they] didn't get handgun calls every single day," and he was concerned because "there was a mention of a handgun."
The officers arrived at Dean Tire about 1:45 a.m. The tire center was closed. The lot was "dark" except for a "dull, yellowish" street light illuminating the pay phone. Both the lot and the street were empty. As Officer Leeper pulled into the parking lot, he observed "a black male" using the pay phone and decided to make a "field inquiry." According to Officer Leeper, based on his ten years of experience as a Morristown police officer, he thought it was "odd" for someone to be using the telephone at that late hour.
Officer Leeper stopped his car fifteen to twenty feet from the phone. Officer Lodato parked "directly alongside." Both officers then "walked over to the gentleman on the phone [later identified as defendant Michael Richards, and] observed that he was ... actively involved in a conversation." Officer Leeper could see both of defendant's hands, neither of which revealed a gun. There was no indication that either of the officers recognized defendant or knew him from other street encounters. Officer Leeper then "asked [defendant] if he didn't mind, could he hang up the phone. I'd like to talk to [you]." Defendant, who had his back turned to the officers, glanced back at them and continued to talk for a moment before hanging up the telephone.[4]
Officer Leeper then told defendant that they had received an "anonymous phone call[] that there was a black male on the pay phone at Dean Tire, in addition to two other black males in front of 15 Martin Luther King Avenue[,] and that the three men were allegedly involved in narcotics transactions, and that one of them was supposedly armed with a handgun." Defendant did not react, and there is no evidence that he made any "furtive gestures" or that he appeared nervous. Officer Leeper asked defendant for identification, a request which the officer described as "routine." Once again, defendant did not respond. He just "stared at [the officer]," without saying or doing anything. Officer Leeper thought it was "odd" that he would not "at least give [him] some explanation" and "strange that he didn't answer the question at all, and [he] got a little alarmed."
As a result, Officer Leeper asked defendant "if he [would] mind stepping over to my [patrol] car and put his hands on the *141 hood ... [because he] wanted to conduct a pat-down search of his outer clothing." At that point, defendant moved his left hand toward his pants pocket, but Officer Lodato stopped him by "gently" placing his hand on defendant's forearm. Officer Lodato then asked defendant to "keep [his] hands in plain sight where we [could] see them please, and place them on the hood of the car." Officer Leeper explained to defendant that he was concerned for his safety and wanted to conduct a pat-down. Officer Lodato then released defendant's forearm, but defendant did not comply. Instead, he moved his hand toward his pants pocket again, causing Officer Leeper to become concerned that he was reaching for a handgun.
At that point, defendant broke his silence, stating "[W]hat for, why are you bothering me." As he spoke, he began to get excited and to raise his voice, shouting "[W]hat for, why, why do I have to do this, why do I have to put my hands on the hood of the car." Officer Leeper asked him to lower his voice because they were in a residential neighborhood, and warned that if he did not, he would arrest him for disorderly conduct. Defendant continued to "shout and yell." Officer Leeper again warned him to keep his voice down, but defendant "refused to calm down." As a result, Officer Leeper advised defendant he was under arrest. Upon hearing this, defendant again reached for his pants pocket and the officers grabbed his arms and handcuffed him. The entire encounter took three to five minutes.
After his arrest, the officers searched him. Cf. State v. Dangerfield, 171 N.J. 446, 795 A.2d 250 (2002). No gun was found in defendant's possession but the police discovered sixty-three small bags of cocaine and four small bags of marijuana inside defendant's pants pocket. Laboratory analysis later showed that these bags contained 18.36 grams of cocaine and 9.54 grams of marijuana.
Defendant did not testify at the suppression hearing. The judge summarized his findings of fact based upon the testimony of Officer Leeper which was "essentially uncontradicted." Relying on State v. Sharpless, 314 N.J.Super. 440, 715 A.2d 333 (App.Div.), certif. denied, 157 N.J. 547, 725 A.2d 12 (1999), and State in the Interest of C.B., 315 N.J.Super. 567, 719 A.2d 206 (App.Div.1998),[5] the judge found that even though the telephone tip from the unknown informant was not corroborated, there was sufficient reasonable suspicion for a Terry stop and even a "frisk" of defendant, had defendant's unruly conduct not intervened making the "frisk" unnecessary.
The judge determined that, in light of the totality of the circumstances, there was a reasonable basis for the stop. As factors supporting his decision, the judge pointed out defendant's silence in response to the officer's advice that he had received a report that a black male in the phone booth supposedly had a gun and defendant's non-response to the officer's request for identification. As an additional suspicious circumstance, the judge indicated defendant's attempt to place his hand in his pocket after the officer told him that he wanted to conduct a pat-down.
On appeal, defendant argues that "the investigatory initial stop of the defendant *142 was not based on any reasonable suspicion of criminal activity and, as such, was unconstitutional." He, therefore, maintains that any evidence found as a result of the stop should have been excluded as the fruit of an unlawful search. Specifically, defendant asserts that there was no suspicious activity occurring; defendant's hands were visible and there was no sign of a weapon; defendant did not appear nervous; no drug transaction was observed; police did not recognize defendant from any previous encounters; defendant did not try to flee the scene; and there was no indication this was a high-crime area. He further indicates that because this was a low income, black and Hispanic neighborhood, a black man on a pay phone late at night was not out of the ordinary. In addition, defendant also implicitly argues that he was not required to respond to the officer's questions; indeed he had a constitutional right to refuse to respond, and that his silence could not be used as a ground for concluding he was armed and dangerous to justify a frisk for a weapon.
The State counters that the totality of the circumstances as recited by the motion judge satisfies the threshold requirements for an investigatory stop in this case.
As always, the starting point of our analysis is the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. These provisions protect citizens against unreasonable searches and seizures by requiring a warrant issued upon probable cause unless the search or seizure qualifies under one of the exceptions of the warrant requirement. State v. Maryland, 167 N.J. 471, 482, 771 A.2d 1220 (2001) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973)).
The present case involves the "protective stop" exception to the warrant requirement under Terry, supra, 392 U.S. at 1, 88 S.Ct. at 1868, 20 L. Ed.2d at 889. See State v. Roach, 172 N.J. 19, 23, 796 A.2d 214 (2002).[6] To justify invoking this exception, the State must demonstrate that the police had an objective articulable and reasonable basis to believe he was armed and dangerous to justify the "stop." Roach, supra, 172 N.J. at 23, 796 A.2d 214; see also State v. Davis, 104 N.J. 490, 499-500, 517 A.2d 859 (1986).
In Terry, the Court held that "a police officer may in appropriate circumstances... approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," and that the officer may conduct a reasonable search for weapons if he is "justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." Terry, supra, 392 U.S. at 22, 24, 88 S.Ct. at 1880, 1881, 20 L.Ed.2d at 906, 908.
"[T]he level of reasonable suspicion necessary to justify an investigatory stop is `something less than the probable cause standard needed to support an arrest.'" State v. Arthur, 149 N.J. 1, 8, 691 A.2d 808 (1997) (citing State v. Thomas, 110 N.J. 673, 678, 542 A.2d 912 (1988)). "There must be `some objective manifestation that the suspect was or is involved in criminal activity.'" Ibid. (citations omitted). *143 In evaluating the facts giving rise to the officer's suspicion of criminal activity, courts are to give weight to "the officer's knowledge and experience" as well as "rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise." Id. at 10-11, 691 A.2d 808.
The determination whether the police have the reasonable suspicion required to justify an investigatory stop depends on the totality of the circumstances known at the time. State v. Stovall, 170 N.J. 346, 361, 788 A.2d 746 (2002). In evaluating the circumstances surrounding the police-citizen encounter, the reviewing court "must balance the State's interest in effective law enforcement against the individual's right to be free from unwarranted and/or overbearing police intrusions." State v. Caldwell, 158 N.J. 452, 459, 730 A.2d 352 (1999) (quoting Davis, supra, 104 N.J. at 504, 517 A.2d 859).
In making this evaluation, the court should consider an anonymous tip as a factor in evaluating the circumstances because "a descriptive tip by an informant may contribute to a reasonable objective and particularized suspicion to serve as the basis for an investigatory stop." Stovall, supra, 170 N.J. at 361, 788 A.2d 746; Caldwell, supra, 158 N.J. at 467, 730 A.2d 352 (Handler, J., concurring).
However, an unverified and uncorroborated informant's tip does not by itself justify a Terry stop. See Caldwell, supra, 158 N.J. at 460-61, 730 A.2d 352; see also Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 2416, 110 L. Ed.2d 301, 308 (1990); Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L. Ed.2d 612, 617-18 (1972). And that is so even if the tip is of a gun in the possession of a suspect. See Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).
In J.L., the United States Supreme Court declined to adopt a "man with a gun exception" to the rule of individualized reasonable suspicion to "stop and frisk" and ordered the evidence suppressed. J.L., supra, 529 U.S. at 272, 120 S.Ct. at 1379, 146 L.Ed.2d at 261. We rely on the holding of J.L. in discussing the issues in this case because the federal and state standards for assessing the reasonableness of investigatory stops and pat-down searches for weapons incident to such stops are identical. See State v. Goree, 327 N.J.Super. 227, 236, 742 A.2d 1039 (2000) (citing State v. Valentine, 134 N.J. 536, 543, 636 A.2d 505 (1994)); see also Thomas, supra, 110 N.J. at 685, 542 A.2d 912.
In J.L., the police received an anonymous telephone call reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." J.L., supra, 529 U.S. at 268, 120 S.Ct. at 1377, 146 L. Ed.2d at 259. When the police arrived at the bus stop six minutes later, they saw three black males, one of whom, J.L., was wearing a plaid shirt. J.L., supra, 529 U.S. at 268, 120 S.Ct. at 1377, 146 L. Ed.2d at 259. J.L. made no threatening or unusual movements, and the officers could not see a firearm. J.L., supra, 529 U.S. at 268, 120 S.Ct. at 1377, 146 L.Ed.2d at 259. Nevertheless, on the basis of the anonymous tip alone, one of the officers searched J.L. and found a gun in his pocket. J.L., supra, 529 U.S. at 268, 120 S.Ct. at 1377, 146 L.Ed.2d at 259. The Supreme Court held that this search was an invalid Terry stop because the anonymous tip alone did not contain the indicia of reliability required to provide the officer with reasonable suspicion that J.L. was carrying a gun. J.L., supra, 529 U.S. at 272-274, 120 S.Ct. at 1379-1380, 146 L.Ed.2d at 262.
The Supreme Court reasoned that the basis of the officers' suspicion that J.L. *144 was carrying a weapon arose not from any observations of their own but "solely from a call made from an unknown location by an unknown caller." J.L., supra, 529 U.S. at 270, 120 S.Ct. at 1378, 146 L.Ed.2d at 260. Because the tip standing alone lacked indicia of reliability, the Supreme Court concluded it could not justify the "stop and frisk" for the suspected firearm. J.L., supra, 529 U.S. at 270, 120 S.Ct. at 1378, 146 L.Ed.2d at 260.
Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, ... "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.... As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop."
[J.L., supra, 529 U.S. at 270, 120 S.Ct. at 1378, 146 L.Ed.2d at 260 (citations omitted).]
Because the anonymous call in J.L. "provided no predictive information," it "left the police without means to test the informant's knowledge or credibility." J.L., supra, 529 U.S. at 271, 120 S.Ct. at 1379, 146 L.Ed.2d at 260. Accordingly, the Court determined the police lacked a reasonable basis for suspecting J.L. of engaging in unlawful conduct. J.L., supra, 529 U.S. at 271, 120 S.Ct. at 1379, 146 L.Ed.2d at 260. And that was so even though the report of a gun proved correct.
The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.
[J.L., supra, 529 U.S. at 271, 120 S.Ct. at 1379, 146 L.Ed.2d at 260.]
Accordingly, the Court concluded that standing alone the anonymous tip did not justify the investigatory stop and ensuing frisk. J.L., supra, 529 U.S. at 272, 120 S.Ct. at 1379, 146 L.Ed.2d at 261.
Relying on the Florida Supreme Court's decision in J.L., we reached the same conclusion in State v. Goree, 327 N.J.Super. 227, 235, 742 A.2d 1039 (2000). See J.L. v. State of Florida, 727 So.2d 204 (Fla.1998). There, a police officer received a dispatch to investigate a report of a black male with a gun in a green and purple multi-purpose vehicle in the area of Tioga and Van Hook streets in Camden. Goree, supra, 327 N.J.Super. at 230, 742 A.2d 1039. The informant gave no description of the man. When the police arrived, they found a vehicle of that description parked a block away from the intersection. Ibid. The defendant was then located sitting in a bar. Id. at 231, 742 A.2d 1039. When the police officer approached and talked to the defendant they had no description to confirm that he was actually the "black man with a gun in the vehicle." However, one of the officers recognized the defendant from having seen him drive the vehicle. Accordingly, he asked the defendant if the green and purple vehicle was his. The defendant responded "[n]o, but I have the keys," whereupon the officer asked him if he would step outside. Ibid. The defendant left the bar with the officer. When the officer indicated he wanted to pat the defendant down, the defendant became belligerent and resisted. Writing for this court, Judge King reasoned: "there was no attempt on the part of the defendant to flee the scene or any other suspicious behavior before the attempted pat-down." Id. at 241, 742 A.2d 1039. The defendant *145 was simply a man sitting in a bar who had not displayed any criminally suspicious conduct prior to the attempted pat-down. Hence, we concluded there was no articulable and reasonable basis for the stop and frisk. Thereafter, the United States Supreme Court affirmed the Florida Supreme Court's rejection of the stop. J.L., supra, 529 U.S. at 269, 120 S.Ct. at 1378, 146 L. Ed.2d at 259.
In contrast, in Sharpless, supra, 314 N.J.Super. at 450, 715 A.2d 333, and C.B., supra, 315 N.J.Super. at 575, 719 A.2d 206, relied on by the motion judge and decided before Goree and the United States Supreme Court's decision in J.L., we observed that because of the imminent danger posed by firearms, an anonymous tip that a person is armed should be treated differently than a tip concerning other forms of criminal activity. Therefore, we concluded that such a tip may provide the basis for a "stop and frisk" even though the informant does not make any prediction of future behavior which implicitly is verified by police observations. Sharpless, supra, 314 N.J.Super. at 452, 715 A.2d 333. Because this view was rejected by the United States Supreme Court in J.L., to the extent Sharpless and C.B. can be read to hold otherwise, we decline to follow them.
Applying J.L. to the facts here, we view defendant in the instant case in the same light as the juvenile in J.L. and Mr. Goree: Defendant was simply a man talking on a public telephone late at night who was approached by a police officer on an anonymous tip containing no descriptive content given by a person with no track record as an informant. Because that type of anonymous tip standing alone cannot justify a Terry stop, we examine the anonymous tip together with the other circumstances relied on by the motion judge to determine whether in their totality they would establish an articulable and reasonable basis for the stop. We turn first to defendant's non-responsiveness to the police questioning.
Recently, our Supreme Court iterated a citizen's rights upon being approached by a police officer in a public place to make a "field inquiry." See Maryland, supra, 167 N.J. at 483, 771 A.2d 1220 (quoting Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983)) (emphasis added). In Maryland, the Court stated that such a person
need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

[Maryland, supra, 167 N.J. at 483, 771 A.2d 1220 (emphasis added) (citations omitted).]
This right not to respond to police questioning was first recognized in Terry, supra, where, in a concurring opinion, Mr. Justice White stated:
There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.... Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation.

[Terry, supra, 392 U.S. at 34, 88 S.Ct. at 1886, 20 L. Ed.2d at 913 (White, J., concurring) (emphasis added); see also State v. Sheffield, 62 N.J. 441, 446, 303 A.2d 68 (1973).]
Notably, on cross-examination, during a colloquy between the defense attorney and Officer Leeper, the officer expressly acknowledged *146 defendant's rights not to answer the officer's questions and not to identify himself:
Q. My question was at the time that you pulled up, he was another member of the public doing something completely legal. Am I correct?
A. Yes.
Q. And, in fact, he didn't have to give you any identification now, did he?
A. No, he didn't have to.
Q. Okay. I mean he wasn't a suspect, correct. Correct?
A. Correct, yeah.
Q. Okay. He wasn't under arrest when you pulled up, correct?
A. No, he was not under arrest.
Q. So he had the unfettered right to ignore any of your requests at that point in time. Am I correct?
A. Correct.
Q. And, in fact, when he askedwhen you asked him for identification, that's exactly what he did, wasn't it?
A. He didn't respond to the question at all. He didn't refuse to give me identification.
Q. He didn't have to, did he?
A. No.
Q. And when he refused to cooperate with you, that's when you asked him to go over to the car to be patted down. Am I correct?
A. It aroused my suspicions, yes. I asked him then to step over to the car, that I wanted to do a pat-down search of his outer clothing for a possible weapon.
Q. Okay. It aroused your suspicion. What was he doing that was illegal that aroused your suspicion?
A. People don't normally refuse to give me identification. During my 10 years on the road, most people give me an explanation as to why they don't have ID, or they give me ID. That I found very odd, it alarmed me.
Q. It alarmed you that someone was exercising his rights?
A. In the context of this call it alarmed me, yes. I was concerned for my safety.
It is clear that the right to ignore police questioning has become a part of our constitutional fabric and would become unraveled if its exercise were used to justify a Terry stop. See Caldwell, supra, 158 N.J. at 469, 730 A.2d 352 (Handler, J., concurring). See also State v. L.F., 316 N.J.Super. 174, 178-79, 719 A.2d 1272 (App.Div. 1998). Hence, we believe defendant's silence gave rise to only a subjective "hunch" by Officer Leeper that defendant may be armed and dangerous. See Arthur, supra, 149 N.J. at 8, 691 A.2d 808. Consequently, it was insufficient to establish an objective articulable and reasonable basis to justify the investigatory stop. Compare Roach, supra, 172 N.J. at 24, 796 A.2d 214 (listing "frenetic circumstances" where it was reasonable for officers to fear for their safety: a nervous and intoxicated driver legally stopped for a motor vehicle violation who rebuffed lawful police orders, exhibited blood on his shirt, had a protruding bulge in the waist of his pants and reached for the bulge).
Moreover, even when defendant's non-responsiveness is considered together with the anonymous tip, the Terry stop cannot be justified. Although the officer was responding to an anonymous tip of a man who might have been dangerous, that possibility cannot obliterate defendant's right to refuse to answer the officer's questions.
That said, we would be remiss if we did not acknowledge that "these anonymous-tip gun and drug cases, especially gun cases, are close and difficult, waffling about in a `no-man's land' of nuances." Goree, supra, 327 N.J.Super. at 244, 742 *147 A.2d 1039. And, of course, we are mindful that "[o]ftentimes ... law-enforcement officers must make instantaneous decisions about whether a frisk for weapons is justifiable. The task is an unenviable one often fraught with life-and-death consequences." Roach, supra, 172 N.J. at 28, 796 A.2d 214 (citations omitted). Nonetheless, without more, the Terry stop in this case cannot be justified.
Therefore, we must consider whether the following additional circumstances would provide sufficient support for the "stop." We think not. The neighborhood was not a high-crime or high-drug area; it was a low income neighborhood. Indeed, as Officer Leeper stated, handgun reports were not an everyday occurrence, and there was no reason to believe this anonymous tip would prove correct. Defendant had made no furtive gestures nor did he appear nervous. All he did was stand quiet in the face of police presence.
Moreover, forty-five minutes had passed since Lieutenant Wilcox received the anonymous tip. Any number of people could have used the phone in that time period. In addition, talking on a public pay phone at 1:45 a.m. is not the type of "highly suspicious activity" that should give rise to a fear that the person using the phone may be involved in criminal activity. Indeed, even Officer Leeper did not find it to be suspicious; all he observed was that it was "odd." But not everyone in a low income neighborhood has a telephone, and, not everyone goes to sleep after the 11:00 o'clock news. Hence, we deem this activity benign in the context of this case.
Further, it is noteworthy that the initial anonymous report had been of a narcotics transaction involving three black males, two on Martin Luther King Avenue, and one on Abbett Street. Yet, no evidence whatsoever was adduced at the suppression hearing concerning the other two suspects, and certainly no connection between them and defendant was made. Accordingly, no suspicion can reasonably be attached to defendant based on the general, unverified, anonymous report of narcotics transactions occurring at some distant location.
In sum, what this record does not show is more persuasive than what it does reveal. See State v. Tucker, 136 N.J. 158, 169, 642 A.2d 401 (1994). The officer did not see a handgun in defendant's hands as he approached him, nor any bulges or suspicious conduct that suggested defendant was hostile or dangerous. The officers did not know defendant from prior criminal encounters. The neighborhood was not a high-crime area and guns were not a frequent concern in the area. The informant was not reported to be someone who had proved to have been reliable in the past, and he gave no specific description of the person on the telephone other than his race. Defendant cooperated by hanging up the phone after being asked to do so. Granted, he did not respond to the officer or give him identification,[7] but he had a right not to respond, and indeed could have walked away. Once defendant declined to answer, the officers should have returned to their patrol vehicles and continued to make further observations if they believed it was necessary. See Terry, supra, 392 U.S. at 34, 88 S.Ct. at 1886, 20 L. Ed.2d at 913 (quoted in Sheffield, supra, 62 N.J. at 446, 303 A.2d 68).
Lastly, we note that to the extent that Officer Leeper's advice to defendant of his intent to pat him down precipitated *148 defendant's reaching toward his pants pocket, we view that circumstance as a police-created circumstance which may not be relied upon after the fact to justify the Terry stop. See Goree, supra, 327 N.J.Super. at 242, 742 A.2d 1039.
We conclude that the totality of the circumstances presented by the State in support of the motion to suppress did not establish a reasonable suspicion that defendant was armed and dangerous justifying the Terry stop. Because the contraband found in defendant's possession was a fruit of that illegal seizure, it must be suppressed.
The order denying the motion to suppress is reversed, the convictions are reversed, and the matter remanded for further proceedings not inconsistent with this decision.
NOTES
[1] It appears that the judge did not find defendant guilty of violating N.J.S.A. 2C:33-2a(1) (improper behavior).
[2] The trial record reflects that Lieutenant Wilcox received the call at about 1:00 a.m., although there is some ambiguity surrounding that fact. The motion record does not mention the time Lieutenant Wilcox received the anonymous call.
[3] The record is silent concerning the results of the police investigation of the Martin Luther King Avenue location.
[4] Officer Leeper did not recall having to ask defendant to hang up more than once before he complied but apparently Officer Lodato's police report reflected otherwise, i.e., that Officer Leeper had to ask two or three times. The report was not marked for identification or admitted in evidence.
[5] Sharpless, supra, and C.B., supra, essentially recognize the right of a police officer to "stop and frisk" a person on an anonymous tip that the person is armed with a gun despite lack of corroborating evidence or evidence of the informant's reliability. The correctness of these decisions has been placed in serious doubt by a decision of the United States Supreme Court, Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L. Ed.2d 254 (2000), which we discuss at length later in this opinion.
[6] Although the police investigation here began as a "field inquiry," it quickly escalated into a full Terry stop after defendant did not respond to the officer's questioning and was asked to place his hands on the patrol car. At that point, he was no longer free to leave. See State v. Rodriguez, 172 N.J. 117, 796 A.2d 857 (2002). The State does not argue otherwise.
[7] We note the irony of the situation: Had defendant complied with the request for identification by reaching toward his pants pocket, it is likely he would have been immediately restrained and frisked.