**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4233-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DARREN P. DONNELLY,

      Defendant-Appellant.

---

Argued March 18, 2019 – Decided April 8, 2019

Before Judges Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 17-09-0607.

Rochelle M. Watson, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Rochelle M. Watson, of counsel and on the brief).

Alanna M. Jereb, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Erin M. Campbell, Assistant Prosecutor, on the brief).

PER CURIAM

Following denial of his motion to suppress evidence seized without a search warrant, defendant Darren Donnelly pled guilty to second-degree possession of a handgun, N.J.S.A. 2C:39-5(b), pursuant to a negotiated plea agreement. Defendant was sentenced to a five-year prison term with one year of parole ineligibility. According to the terms of the plea agreement, the remaining fifteen counts charged in the Hudson County indictment were dismissed. The judge also imposed all mandatory assessments and penalties.

The sole issue before us in this appeal is whether the trial judge erred in denying defendant's motion to suppress evidence seized as a result of a warrantless search incident to a Terry[1] stop. More particularly, defendant argues:

> THE 9-1-1 CALL, VAGUE IN ITS DESCRIPTION OF THE MAN WITH THE GUN, DID NOT PROVIDE REASONABLE SUSPICION TO STOP DEFENDANT, WHO WAS NOT AT THE LOCATION REPORTED AND WHOSE CLOTHING DID NOT FIT THE DESCRIPTION PROVIDED.

We reject these contentions and affirm.

At the suppression hearing, the State presented the testimony of one witness: Harrison Police Officer Joseph Sloan, who was assigned to the Crimes

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

Suppression Unit at the time of the incident. The State moved into evidence four photographs depicting: defendant's appearance at the time of his arrest; the scene of the incident; and the weapons seized from defendant's person. Defendant did not testify or present any witnesses, but moved into evidence the 9-1-1 recording.[2]

Sloan testified that on July 4, 2017, at approximately 2:21 a.m., he was patrolling Harrison Avenue in a marked police vehicle when he was dispatched to the Manor Bar, which "was about two blocks away" from his location. According to Sloan, "The initial call from dispatch stated that an individual pointed a firearm at another individual and they [sic] gave a description [of] an older white male." Sloan also was told the suspect "was possibly under the influence of alcohol" and was wearing a "brown [T-]shirt."

Traffic in the area was minimal; Sloan arrived at the bar "[n]o more than ten seconds" after he was dispatched. As Sloan approached the scene, he observed two Kearny police officers park their patrol cars "less than five seconds" before he parked. Sloan saw two people in the vicinity of the bar: one

---

[2] Defendant did not include any of the exhibits in his appendix. At oral argument before us, defense counsel indicated the photographs were not pertinent to any disputed issues on appeal, and the 9-1-1 call was played at the hearing for cross-examination purposes only.

A-4233-17T4

person was standing at the bar's entrance, and defendant, who had just been stopped by the Kearny officers, was standing across the street.

When he approached defendant, Sloan observed defendant's eyes were bloodshot and his speech was "slurred." Sloan "[i]mmediately" recognized defendant, having seen him "sit[ting] out front [of the bar] on a daily basis." Further, "[one] month or two months prior to the incident[,]" Sloan's "supervisor pointed . . . defendant out and said be careful, he's known to carry weapons on him."

Sloan "ordered [defendant] to put his hands against the fence[,]" intending "to pat him down for weapons[,]" when Sloan "saw in plain view . . . a large knife sticking out of the . . . small of his back." Incident to defendant's resulting arrest, Sloan seized a .25 caliber handgun and "the rest of the knives"[3] from defendant's shorts.

Referencing his arrest photograph, Sloan described defendant's appearance on the date of the incident. In particular, the photograph depicted a "Caucasian . . . older gentlemen, possibly in his [sixtie]s," wearing a "gray-greenish shirt." Defendant's eyes were "half shut" in the photograph.

---

[3] Sloan initially testified that he seized a .22 caliber handgun but later corrected his testimony; the quantity of knives seized was not adduced at the hearing.

A-4233-17T4

On cross-examination, Sloan acknowledged defendant's "gray-greenish shirt" could be described further as a "camouflage shirt" with "a collar" and "buttons," but it was not a brown T-shirt as described by the 9-1-1 caller. Further, Sloan clarified that he was dispatched to "434 Harrison Avenue, [which] is about five blocks away from the Manor Bar." After the 9-1-1 call was played at the hearing, Sloan also agreed that the person who was intoxicated was the caller and not "the person who was firing the shots."[4]

After the hearing concluded, the attorneys submitted briefs, and the judge rendered an oral decision on January 19, 2018. Based on the testimony he heard and his observation of the witness, the judge made credibility and factual findings, which were mostly consistent with the recitation of facts set forth above.[5] Overall, the judge found Sloan's testimony credible, acknowledging

[4] It is unclear from the record whether Sloan knew at the time he was dispatched to the scene that the caller said the suspect had fired shots. Sloan later explained he was not privy to "the entire conversation [captured on the 9-1-1 recording] because most of the conversation was between the dispatcher and the caller" and he "only received the dispatcher's transmission."

[5] At the conclusion of the judge's decision, defendant challenged his finding that the 9-1-1 caller indicated the suspect was intoxicated. The judge immediately reviewed the 9-1-1 call on CourtSmart, without the benefit of a transcript, and determined there "was no mention by the 9-1-1 caller that the suspect was intoxicated and . . . Sloan said it." As noted by defendant in his merits brief, that "mistake" did not affect the judge's decision. Unlike the trial

inconsistencies that did not impact his decision, and determined the stop was justified. The judge ultimately found the pat down of defendant was permissible because the events and circumstances leading up to it provided a sufficient basis for a protective search. Accordingly, the judge denied the suppression motion. This appeal followed.

Our review of a trial court's decision on a suppression motion is circumscribed. We defer to the trial court's factual and credibility findings, as long as they are supported by sufficient credible evidence in the record. State v. Handy, 206 N.J. 39, 44 (2011); State v. Elders, 192 N.J. 224, 243 (2007). Deference is afforded because the "findings of the trial judge . . . are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Reece, 222 N.J. 154, 166 (2015) (alteration in original) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). We disregard a trial court's factual and credibility findings only if clearly mistaken. State v. Hubbard, 222 N.J. 249,

---

judge, however, we were provided with a copy of the transcript of the hearing, which included the 9-1-1 call played at the hearing. The transcript reveals, in pertinent part, that the caller stated, "he's shooting in the sky, he's drunk." (Emphasis added). As noted above, it is unclear from the record whether Sloan was privy to that communication. However, Sloan testified that his "initial perception from what the dispatcher stated was that the suspect was under the influence."

262 (2015). The legal conclusions of the trial court, however, are reviewed de novo. Id. at 263.

In this case, defendant primarily contends "[t]he quality and quantity of information . . . do not amount to reasonable suspicion." To support his argument, defendant claims his clothing and the location of his arrest did not match the 9-1-1 caller's description; Sloan failed to corroborate the allegation that defendant had pointed a gun at the caller; and Sloan's knowledge that defendant was "known to carry weapons" was unreliable. Like the trial judge, we reject defendant's contentions.

Fundamentally, a police officer has a right "to conduct a brief, investigatory stop." State v. Morrison, 322 N.J. Super. 147, 151-52 (App. Div. 1999); see also Terry, 392 U.S. at 20-21. An investigative or so-called Terry stop does not require probable cause to believe a person has committed or is about to commit an offense. State v. Nishina, 175 N.J. 502, 510-11 (2003). Rather, "[a] police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer ha[s] a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002) (citing Terry, 392 U.S. at 21). In determining whether an investigative detention is

A-4233-17T4

justified under the reasonable suspicion standard, "a court must consider the 'totality of the circumstances—the whole picture.'" Id. at 361 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

Where, as here, an "anonymous tip is conveyed through a 9-1-1 call and contains sufficient information to trigger public safety concerns and to provide an ability to identify the person, a police officer may undertake an investigatory stop of that individual." State v. Gamble, 218 N.J. 412, 429 (2014). That is because courts treat anonymous 9-1-1 calls as more reliable than other anonymous tips, owing to "technological and regulatory features of the 9-1-1 system which safeguard against false reports." Id. at 430.

The stop in this case was based on Sloan's belief that an "older white male" had "pointed a firearm at another individual" who might "be intoxicated." Although, as the trial judge aptly observed, the 9-1-1 caller did not describe defendant with "pinpoint" accuracy, the caller's description "somewhat described . . . defendant." That description, contrary to defendant's argument, was corroborated by the events that quickly transpired after Sloan was dispatched to the scene.

Specifically, in the seconds it took Sloan to arrive there, he did not encounter anyone other than defendant and the individual standing in front of

the bar. Sloan "[i]mmediately" recognized defendant, a white male who appeared to be in his sixties, wearing a "gray-greenish" shirt. Given the darkness of the hour, it was reasonable for Sloan to conclude "at the time [the shirt defendant was wearing] fit the description" given by the caller. Moreover, based on information recently received from his sergeant, Sloan had a heightened sense of awareness that defendant was known to carry weapons. Defendant's bloodshot eyes and slurred speech also corroborated the caller's tip that the suspect was drunk.

From our review of the record, we conclude the totality of the circumstances supports the judge's conclusion that a reasonable articulable suspicion existed to stop defendant. Indeed, the "whole picture" underscores Sloan's belief that defendant had "just engaged in, or was about to engage in, criminal activity." Stovall, 170 N.J. at 356, 361 (citation omitted). We are thus satisfied the judge's factual findings are substantially supported by sufficient credible evidence in the record. Those findings were based on the judge's assessment of the demeanor of the witness as he testified, and the judge's feel of the case. Accordingly, we defer to his findings. Reece, 222 N.J. at 166.

Further, we agree with the trial judge that "[g]iven the information available to . . . Sloan, an objectively reasonable person would believe that he

[was] dealing with an armed and dangerous individual.  Therefore, [Sloan] was well within his powers under <u>Terry</u> to conduct the pat[-]down search of . . . defendant."  <u>See</u> <u>State v. Richards</u>, 351 N.J. Super. 289, 299 (App. Div. 2002) (quoting <u>Terry</u>, 392 U.S. at 24) (once stopped, an officer is permitted to "conduct a reasonable search for weapons if he is 'justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others'").

Predicated upon the officer's understanding of the 9-1-1 call made to the Harrison Police Department, as relayed by the dispatch officer, and corroborated by his observations of defendant upon their encounter, it was objectively reasonable for Sloan to suspect defendant was armed with a handgun.  Given the totality of the circumstances presented, we therefore conclude the pat-down search was lawful.  <u>State v. Roach</u>, 172 N.J. 19, 27 (2002).[6]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6]    Arguably, Sloan's pat down of defendant also was supported by his observations of the knife protruding from defendant's shorts even before the officer began his search for weapons.  <u>See</u> <u>State v. Basil</u>, 202 N.J. 570, 585 (2010); <u>State v. O'Neal</u>, 190 N.J. 601, 612 (2007) (probable cause is a fluid concept, requiring a common sense approach).