**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1273-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SALAHUDDI F. SMART,
a/k/a/ SAL DYSHON,
SMART DYSHON, JAMES
B. JOHNSON, DYSHON
F. SMART, SALAHUDDI
SMART, SALAHUDDI R.
SMART, DYSHON SMART,
SALAHUDDIN SMART,
JAMES JOHNSON, TROY
IRVIN, AMIR, and SAL SMART.

     Defendant-Appellant.

_____

Submitted October 28, 2021 – Decided November 30, 2021

Before Judges Whipple, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment Nos. 18-02-0409 and 19-01-0169.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Hannah M. Franke, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Salahuddi F. Smart appeals from a Law Division order denying his motion to suppress physical evidence seized from his person and a subsequent judgment of conviction. We reverse.

I.

A Camden County grand jury returned Indictment No. 18-02-0409, charging defendant with third-degree possession with intent to distribute a controlled dangerous substance (CDS), N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(13).[1] Defendant moved to suppress evidence seized from his person. We derive the underlying facts from the motion record. Officer Justin Glass of the Delaware River Port Authority Police Department was the sole witness at the suppression hearing.

---

[1] In an unrelated matter, defendant was charged with six offenses under Indictment No. 19-01-0169, including fourth-degree criminal contempt of a domestic violence restraining order, N.J.S.A. 2C:29-9(b).

On November 14, 2017, Glass was monitoring foot traffic at the Walter Rand Transportation Center in Camden via closed-circuit television (CCTV). During the hearing, the State played the CCTV video that captured the initial phase of the incident.

Glass testified that at about 7:20 p.m. on November 14, 2017, he was monitoring foot traffic via closed-circuit television (CCTV) at the Broadway City Hall Sector of the Walter Rand Transportation Center in Camden. He characterized this location as a high-crime area, known for "open-air narcotics transactions."

Glass testified that he "observed a black male sitting on a windowsill engaging in a conversation" "with another black male, at which point [he] observed the black male who was standing place money behind the black male that was sitting on the windowsill. The black male on the windowsill", later identified as defendant, "handed over an unknown object which . . . was believed to be [CDS]." Glass identified defendant as the man sitting on the windowsill.

Glass stated he believed defendant handed over CDS because the man standing up transferred what Glass believed to be United States currency. However, Glass was unable to discern the object defendant transferred to the other man. He was unable to describe the shape or size of the object. Glass

3

candidly admitted he did not know what was in defendant's hand—conceding that he had no clue what it was.

However, based on "the shape, the size[,] and the fact that it was folded," Glass believed but could not positively identify that the object transferred by the man standing up to behind defendant's back was cash. Glass deduced that the object transferred from defendant to the man standing up was CDS, even though he could not identify the object.

Glass and two other officers then approached defendant in the lobby of Broadway Hall. Glass "conducted a pedestrian stop." Glass told defendant that the reason he stopped him was he "observed a hand-to-hand narcotics transaction where there was an exchange of monetary value." Glass stated defendant "kept repeating that it was a misunderstanding."

During this conversation, Glass "observed a bulge in [defendant's] left pocket," which Glass believed to be a prescription pill bottle. Glass "asked [defendant] what the item was and if he would turn the item over . . . ." Defendant stated, "it was his prescription medicine" and turned the pill bottle over to Glass. The pill bottle's label stated "[d]efendant's name and that the

prescription was OxyContin[2] or Oxycodone, HCL, [fifteen] milligrams," and was filled November 13, 2017, the day before. Defendant was prescribed ninety pills, but there were only thirty pills in the bottle.

At this point, Glass contacted dispatch and requested a warrant check of defendant, which revealed multiple outstanding arrest warrants. Glass subsequently placed defendant under arrest. When defendant was searched at police headquarters, police found $22 on him, "which was believed to be the proceeds from the narcotics transaction."

However, the CCTV video does not contain video of Glass's interaction with defendant because "[f]or whatever reason, the person that was book marking the incident did not bookmark the entire stop from the time of the . . . violation to the end of when [defendant was] placed under arrest." The video only contains the purported drug transaction between the man standing up and defendant sitting on the windowsill.

---

[2] "Oxycodone is a synthetic drug derived from opium." N.J. Div. of Youth & Fam. Servs. v. Y.N., 431 N.J. Super. 74, 79 n.4 (App. Div. 2013) (citing United States v. Ilayayev, 800 F. Supp. 2d 417, 429 (E.D.N.Y. 2011)). "OxyContin is a controlled-release encapsulation of oxycodone." Ibid. (citing Ilayayev, 800 F. Supp. 2d at 430). Both are prescription narcotic painkillers classified as Schedule II CDS under N.J.S.A. 24:21-6.

The other male walked away and was not apprehended. Accordingly, the police did not seize the suspected CDS that defendant allegedly distributed.

At the conclusion of the testimony, defendant, who was then pro se, argued that Glass had only a "subjective hunch" that defendant was involved in a hand-to-hand CDS transaction. Defendant noted the failure to preserve CCTV video of the pedestrian stop was "suspicious."

In response, the State argued that "a trained officer draws inferences and makes deductions that might well [e]lude an untrained person, [and] that is what we are looking at." The State explained that Glass, who is trained in hand-to-hand transactions and pill identification, witnessed the transaction between defendant and the other man in a high-crime area, and was able to formulate an "articulable and reasonable suspicion" to perform an investigatory stop. Therefore, Glass conducted a lawful investigatory stop.

The State further argued that Glass had probable cause to arrest defendant under the totality of the circumstances. In any event, because defendant had outstanding warrants, the contents of the prescription bottle would inevitably have been discovered during a search incident to arrest.

The judge issued an oral decision and order denying the suppression motion. The judge found Glass credible, noting he "maintained his candor[,]"

6

"was willing to answer questions[,] and [] didn't show any reluctance to answer any questions."

The judge made the following findings of fact. First, defendant, sitting down, and the other man, standing up, were "milling around and the male [standing up] clearly passe[ed] something from his right hand to the right hand of the defendant." The court stated: "Glass felt that was money. I would tell you the [c]ourt's observation that it appeared to be money and also . . . the [c]ourt would say simultaneously there was a transaction of . . . another object [from] the [d]efendant to the person [standing up]." The judge further explained that even if the man standing up did not hand over U.S. currency, "clearly[] there was some quid pro quo exchange . . . ." From there, the court stated:

> there . . . appeared to be a bottle in [defendant's] right hand and then a transaction from [defendant's left hand] to the gentleman [standing up], . . . [which] based upon the officer's knowledge and experience, gave . . . rise to at least an absolute minimum that there was a reasonable suspicion existed at that moment of. . . a suspected drug transaction observation.

Further, the judge found the State approached defendant "in the least intrusive manner," and began to perform a <u>Terry</u>[3] stop. The court then stated: "Thereafter, certainly on a pat-down and their observation, they did find the

---

[3] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

narcotics bottle.  I do find that that was a lawful search under the totality of the circumstances."  The judge concluded that Glass had probable cause to arrest defendant and that the prescription that bottle was found during a search incident to arrest, so a warrant was not needed.  Finally, the judge stated:

> [T]he [c]ourt has to make a practical and commonsense determination that given all of the circumstances there was a fair probability that that contraband or evidence would be found in a particular place . . . .
> [(1T138:8-15)].

Following the denial of the suppression motion, defendant entered a guilty plea to third-degree possession with intent to distribute CDS under Indictment No. 18-02-0409, and fourth-degree criminal contempt under Indictment No. 19-01-0169.  In exchange, the State agreed to recommend a four year-term on the CDS count, a concurrent eighteen-month term on the criminal contempt count, and to dismiss the remaining counts at sentencing.  The State had no objection to defendant being placed on intensive supervised parole (ISP).  Defendant was sentenced in accordance with the plea agreement and the remaining five counts of Indictment No. 19-01-0169 were dismissed.  This appeal followed.

On appeal, defendant argues:

> THE PILL BOTTLE SHOULD BE SUPPRESSED BECAUSE THE POLICE LACKED THE REASONABLE AND ARTICULABLE SUSPICION

NEEDED TO CONDUCT AN INVESTIGATORY
STOP OF DEFENDANT.

## II.

We review a trial court's ruling on a motion to suppress evidence "with substantial deference to the trial court's factual findings, which we 'must uphold . . . so long as those findings are supported by sufficient credible evidence in the record.'" State v. Hinton, 216 N.J. 211, 228 (2013) (quoting State v. Handy, 206 N.J. 39, 44 (2011)). This deference applies to "factual findings based on a video recording or documentary evidence" to ensure that trial courts remain "the finder of the facts." State v. S.S., 229 N.J. 360, 381 (2017). We review a trial court's legal conclusions de novo. Id. at 380.

The Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution generally require police to obtain "a warrant based on probable cause . . . prior to any search or seizure." State v. Harris, 211 N.J. 566, 581 (2012). As such, warrantless searches are presumptively invalid. State v. Pineiro, 181 N.J. 13, 19 (2004) (citing State v. Patino, 83 N.J. 1, 7 (1980)). The State carries the burden to demonstrate that "[the search] falls within one of the few well-delineated exceptions to the warrant requirement." Ibid. (alterations in original) (quoting State v. Maryland, 167 N.J. 471, 482 (2001)).

We first address the constitutionality of the investigatory stop. An exception to the warrant requirement is an investigatory stop, also known as a Terry stop, State v. Rosario, 229 N.J. 263, 272 (2017), which allows police to "detain an individual temporarily for questioning." Maryland, 167 N.J. at 486. To effectuate a lawful investigatory stop, an officer must show "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry, 392 U.S at 21). "The 'articulable reasons' or 'particularized suspicion' of criminal activity must be based upon the law enforcement officer's assessment of the totality of the circumstances . . . ." State v. Davis, 104 N.J. 490, 504 (1986). "There must be 'some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity.'" Pineiro, 181 N.J. at 22 (alteration in original) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). However, "[t]he suspicion need not rise to the 'probable cause necessary to justify an arrest.'" Id. at 20 (quoting State v. Nishina, 175 N.J. 502, 511 (2003)).

While a suspect's presence in a high-crime area is not in any way dispositive, it may be considered when determining whether there was a

legitimate reasonable suspicion of criminal activity.  Compare State v. Bard, 445 N.J. Super. 145, 157-58 (App. Div. 2016) (citing the officer's knowledge that a suspect's location was a high-crime area); with State v. Richards, 351 N.J. Super. 289, 307 (App. Div. 2002) (noting "[t]he neighborhood was not a high-crime area and guns were not a frequent concern in the area.").

Even where the initial stop is deemed constitutional, the court must "determine whether the subsequent scope of the seizure was justified by the particular facts and circumstances of the case."  Davis, 104 N.J. at 504.  Further, when viewed by an experienced and knowledgeable officer, even a suspect's somewhat innocuous conduct may give rise to a sufficient reasonable suspicion. See State v. Citarella, 154 N.J. 272, 275-76, 279-80 (1998) (deeming an officer's reasonable suspicion legitimate where, among other innocuous facts, the officer observed the suspect riding a bicycle in a hurried fashion over the George Washington bridge, then placing his bicycle in the back of a pickup truck; the officer knew the suspect from prior drug crimes and knew defendant lived over two miles in the opposite direction he was headed);  Pineiro, 181 N.J. at 13 (finding a police officer justifiably assumed, based on his experience, that cigarette packs were often used to transfer drugs).

A reviewing court evaluates the totality of the circumstances, "balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." Davis, 104 N.J. at 504. We consider the officer's experience and knowledge. Pineiro, 181 N.J. at 22 (citing Davis, 104 N.J. at 504).

Defendant claims Glass merely had a "hunch" that defendant was engaged in criminal activity, seeing only the exchange of something resembling U.S. currency for an item Glass could not discern. The State argues the trial court correctly found Glass had sufficient information, based on his training and experience, to conduct the investigative stop. The State points to the trial court's finding of a money-for-item exchange in a high-crime area known for drug transactions.

Here, the judge found Glass to be credible. Glass testified that he observed two males on CCTV in an area known for drug trafficking. He observed defendant with what he believed was an orange prescription pill bottle in his right hand, but he was not certain. Glass observed defendant "hand[] over an unknown object" in his left hand, which Glass "believed to be a CDS," but he once again was not certain, conceding he still did not know what it was. Glass clarified that he believed the item that defendant handed over was CDS because

the "Walter Rand Transportation Center is an open-air narcotic [location]" and "[b]ecause of the transfer of the United States currency prior to the transfer of that item."

Glass has worked in law enforcement since 2010. He started as a Class 2 Special Officer. In 2014, he attended the Gloucester County Police Academy and began working as a full-time police officer. Glass testified that he had made thirty to forty prior drug arrests, had received training in recognizing narcotics distribution at the academy, and had subsequently received specialized training in narcotics, including a drug identification course.

Glass observed defendant engage in a hand-to-hand exchange with the other male. The exchange was captured on a video recording. Without being certain as to what he saw, the officer's observations gave rise to a reasonable suspicion that a drug transaction had taken place. We conclude that based on his knowledge, experience, training, and observations, coupled with the location of the exchange, Glass presented a sufficiently particularized suspicion to effectuate a lawful investigatory stop of defendant.

IV.

We next address the constitutionality of the search and seizure and resulting arrest. A warrantless arrest must be based on probable cause. Pineiro,

181 N.J. at 19-21. As we noted above, the federal and state constitutions generally require police to obtain a warrant based on probable cause before conducting a search or seizure. Harris, 211 N.J. at 580-81. "The standards for determining probable cause to arrest and probable cause to search are identical." State v. Moore, 181 N.J. 40, 45 (2004) (citing State v. Smith, 155 N.J. 83, 92 (1998)). To be constitutionally permissible, a warrantless search must fall within a recognized exception to the warrant requirement. Pineiro, 181 N.J. at 19.

Probable cause "is a well-grounded suspicion that a crime has been or is being committed." Nishina, 175 N.J. at 515 (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)). "Probable cause exists where the facts and circumstances within . . . [the officers'] knowledge," based on "reasonably trustworthy information" would "warrant a [person] of reasonable caution" to believe "that an offense has been or is being committed." Pineiro, 181 N.J. at 21 (alterations in original) (quoting Moore, 181 N.J. at 46). In determining whether probable cause existed, courts review the totality of the circumstances and consider the "officer's 'common and specialized experience.'" Moore, 181 N.J. at 46 (quoting Schneider v. Simonini, 163 N.J. 336, 362 (2000)). Courts also consider evidence

A-1273-19

of the high crime rate of an area.  Ibid. (citing State v. Johnson, 171 N.J. 192, 217 (2002)).

We first note there is no evidence in the record, other than a passing comment by the trial court, that Glass or the other officers conducted a pat-down on defendant before he was arrested.  Instead, the record indicates Glass noticed a bulge in defendant's left pocket that resembled a pill bottle and "asked [defendant] what the item was and if he would turn the item over, which he [did]."  An officer eventually conducted a pat-down on defendant after he had turned over the prescription pill bottle in his pocket and was arrested on the outstanding warrants.

Viewed objectively, the video depicts defendant handing an unidentified item to the other male in exchange for what may have been folded money.  There was no observation of narcotics or of packaging commonly used in drug transactions.  Nor was the officer able to confirm that he saw the other male hand currency to defendant.[4]  In any event, defendant only had $22 on him, an

---

[4]  In his affidavit of probable cause, Glass stated that he "observed via CCTV a black male approach the [d]efendant and place money behind the [d]efendant's back.  I observed the [d]efendant remove a prescription pill bottle from his pants pocket."  Glass testified that he believed the item to be U.S. currency because it "appear[ed] to be a rectangle that's folded in half."  However, Glass could not positively identify that it was money.

amount hardly indicative of the sale of narcotic painkillers. The police did not intercept or recover any OxyContin from the other male. The State lacked any direct evidence that defendant handed OxyContin to the other male. It relies instead on admittedly uncertain observations of what was in defendant's left and right hands, and what was placed behind defendant by the other male, and inferences drawn from those observations. Despite the officer's experience and training, and his testimony that the location was used for drug transactions, this paucity of facts did not establish probable cause justifying the arrest or warrantless search of defendant's person. Considering that Glass could not confirm what defendant had in his hands or that money had been handed to him, this amounted to acting on unverified assumptions.

Importantly, the OxyContin that defendant possessed was prescribed for him. It was contained in a labelled prescription pill bottle. Defendant was lawfully in possession of the OxyContin for his own use. It only became illegal if he possessed the OxyContin with intent to distribute it to others. In our view, the totality of the circumstances here prior to the search of the object in defendant's pocket and warrant check fall short of probable cause.

On appeal, the State does not contend that defendant voluntarily and knowingly consented to the search of the object in his pocket. After noticing a

A-1273-19

bulge in defendant's left pocket, Glass simply "asked [defendant] what the item was and if he would turn the item over, which he [did]." The State has the burden of demonstrating that the consent to search exception applies. State v. Legette, 227 N.J. 460, 472 (2017). The State "has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." State v. Johnson, 68 N.J. 349, 354 (1975); see also State v. Shaw, 237 N.J. 588, 618-19 (2019) ("The consent must be voluntary, that is, 'unequivocal and specific' and 'freely and intelligently given.'") (quoting State v. King, 44 N.J. 346, 352 (1965)). "One cannot be held to have waived a right if he was unaware of its existence." Johnson, 68 N.J. at 354.

Defendant was not advised that he had the right to refuse to consent to the search. Defendant turned over the pill bottle, which prompted Glass to request a warrant check. This led to defendant's arrest. Absent being advised of the right to refuse consent, it was not a valid consent to search. State v. Todd, 355 N.J. Super. 132, 138-39 (App. Div. 2002).

The State's fallback position is that the pill bottle and OxyContin would have been inevitably discovered because of defendant's active warrants. Under the inevitable discovery exception, evidence that was unlawfully seized is admissible if it "would inevitably have been discovered lawfully." State v.

Holland, 176 N.J. 344, 361 (2003) (quoting State v. Sugar (Sugar II), 100 N.J. 214, 238 (1985)). The State must show "by clear and convincing evidence that had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition." Id. at 362 (quoting Sugar II, 100 N.J. at 239-40).

The warrant check was conducted after the pill bottle was requested and turned over. The record does not indicate that Glass would have ordered the warrant check if the item in defendant's left pocket was innocuous. See Wong Sun v. United States, 371 U.S. 471, 479-80, 83 S. Ct. 407, 413, 9 L. Ed. 2d 441, 450-51 (1963) (noting that after acquired facts could not bolster probable cause); State v. L.F., 316 N.J. Super. 174, 181 (App. Div. 1998) (noting that facts known at the time "cannot be transmuted into something more nefarious by a hindsight focus on the results of a [subsequent] search the police had no right to conduct"). The State acknowledges that the pill bottle was not discovered as the result of a pat-down[5] and that the trial court found Glass had probable cause to arrest

_____

[5] Moreover, Glass had no objective basis to believe that defendant was armed. Accordingly, there was no lawful basis to conduct a protective frisk for weapons. See State v. Thomas, 110 N.J. 673, 685 (1988) (stating that evidence discovered during a pat-down search of the defendant was suppressed because the "record

defendant only <u>after</u> discovery of the pill bottle. Therefore, the inevitable discovery exception does not apply.

The State did not establish probable cause for the warrantless search of defendant's person. We reverse the denial of defendant's suppression motion, vacate his guilty plea to possession of CDS with intent to distribute under count one of Indictment No. 18-02-409, vacate his conviction and sentence on that count, and remand for further proceedings.

Reversed in part, vacated in part, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[did] not establish a specific, particularized basis for an objectively reasonable belief that defendant was armed and dangerous").